Argued May 23, reversed and remanded June 18, 1973

# STATE OF OREGON, *Respondent, v.*
# ROBERT W. SUGGS (No. 27011), *Appellant.*

511 P2d 405

*Gary D. Babcock,* Public Defender, Salem, argued the cause and filed the brief for appellant.

*John W. Burgess,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and John W. Osburn, Solicitor General, Salem.

Before Schwab, Chief Judge, and Langtry and Foley, Judges.

FOLEY, J.

Defendant was charged with murder of his 29-year-old, retarded stepson. He was found guilty by jury verdict of manslaughter and received a prison sentence of 10 years. He appeals, assigning as error the refusal of the trial court to suppress statements made by the defendant and the failure to submit to the jury as a lesser included offense the crime of criminally negligent homicide. ORS 163.145. We reverse on the basis of the first assignment of error, but because the case must be remanded for a new trial in which the issue involved in the second assignment is likely to recur, we deem it proper to discuss that issue as well. This necessitates a synopsis of the evidence at the trial.

Deceased died almost instantly on September 18, 1972, from the discharge of a shotgun, the barrel of which was about two and one-half feet from deceased when fired. The charge from the gun entered his chest just below the left nipple and proceeded downward at about a 45 degree angle. Present in the one-room cabin at or just prior to the stepson's death were the defendant, his wife and the stepson. The shotgun which produced death was a .410 gauge, single shot which belonged to the wife and was kept in the cabin. The defendant denied that he fired the fatal shot and though his testimony is hazy, the inference which could be drawn from it and from "truth serum" statements he made to a psychiatrist is that the stepson was killed while defendant and his wife were struggling over the gun. Defendant testified the wife was the one who had the gun; that he remembered struggling with her over it. However, he claims to have no recollection of the immediate events leading to the discharge of the gun and the death. Defendant's fingerprints were found on the gun and "gunshot residue" was found on his hands. No "gunshot residue" was found on the wife's hands. Three smudged fingerprints were found on the gun which could not be attributed to either the wife or defendant. The state called defendant's wife as a witness but she was not permitted to testify, the defendant husband claiming the privilege not to allow her to testify.

Defendant's first assignment of error deals with the denial of his motion to suppress statements he made to an officer shortly after his arrest.

The *Miranda* warnings were given to the defendant in Junction City soon after his arrest and defendant was taken to Corvallis about 11 p.m., where

he again was advised of his rights. Defendant stated that he understood his rights. Thereafter the following testimony of police officer Dolan was introduced by the state:

"Q  I would ask you to explain to the Court exactly what transpired during your initial conversation with the defendant, first concerning what the charge was and then concerning, if you will, references to attorneys, what you advised him, what his response to that was. You can start first right at the beginning of that conversation.

"A  Okay. I said, 'Now, Mr. Suggs, we have already advised you or [sic] your rights from this Miranda card and you have indicated to me that you do understand these rights that we have discussed with you.' And I asked then, 'You do understand these rights?' And he replied, 'I understand. I haven't done anything.' I said, 'Okay, and you are willing to talk to us at this time? We haven't—' And I was intending to say, we haven't promised you anything, and he interrupted and he said, 'About anything I know about.' I said, 'Okay, very good. I would like to begin.' Mr. Suggs said, 'I don't understand what it's all about.' I said, 'Well, we will get into that. We need to cover everything carefully. We have advised you at this time that you are under arrest charged with the crime of murder.' Mr. Suggs replied, 'No, you haven't did that.' I answered, 'Do you recall that we did that there in Junction City?' His answer was, 'No, no, I do not.' I says, 'Okay. Do you understand now that you are under arrest and you are charged with the crime of murder?' *Mr. Suggs replied, 'I want an attorney.' I answered, 'You want an attorney?' He said, 'Yes.' I say, 'Okay. Do you have any means to hire an attorney yourself?' His reply was, 'No.' He then said, 'I won't say anything else until I get an attorney.' I repeat his answer, his saying, you won't say anything else until you get an attorney, he said, 'No.' I said,*

'*Okay*. Do you understand the nature of this charge against you, that is the charge of murder?' His reply was, 'I just can't believe it, that's all.' I then said, 'Now, we are going to investigate this matter very carefully and very thoroughly. We have other police officers from Benton County Sheriff's Office, state police assisting us as well. You can rest assured that it will be a thorough job done. If our investigation indicates that you are not the one responsible we certainly will see to it that you are not charged with this crime. Do you understand that?' His answer was, 'Yes, sir.' 'Okay,' I said. '*Unless you have something to hide, some information to keep from us, I can't see that it would be necessary for you to have an attorney, if you are innocent of all charges there is nothing that he could do for you that we could not do.*' His answer was, 'I don't have anything to hide.' I said, 'Okay. I am not going to promise anything to you. *I'm not going to tell you you can't have an attorney. If you wish to have one you can certainly have one to represent you. You can talk to one before you talk to us, this is your decision, but we are not going to railroad you into something.* If you are not involved, have nothing to hide, there would certainly not be any reason for you to be charged of this crime. Do you understand that?' His answer was, 'I do, I understand.' I said, 'Okay. That is what [sic] we want to talk to you, to find out from you your side of what's happened in the recent times and especially tonight.' He then said 'Okay. Let's begin.' I said, 'Okay. *Then you are willing to talk to us without this attorney, I mean this is your decision, we can't force you one way or the other, but we do wish to know what happened.* We want truthful answers as to what has been taking place.' Mr. Suggs replied then, '*I still should have an attorney.*' I said, 'Well, if you wish to have an attorney we cannot really talk to *you.*' His reply to that was, 'I would have to go back too far, you wouldn't understand.' * * * I answered that

'\* \* \* *Now, if you are willing to talk to us we would like nothing better than to listen, but if you insist on having an attorney you can certainly have one. If you can't afford one one will be appointed through the court.' Mr. Suggs then replied, 'No, sir. I can't afford anything.' I answer, 'Okay. Are you willing to go ahead and talk to us now then? We would like to understand what has happened.' At this point Mr. Suggs began to cry in his answer in saying, 'There are just some things, Officer, you can't talk about. I loved that woman.' I asked* him next, 'Have you been married for quite some time?' And his answer to that was, 'Almost three years.'

"Q At that point, Officer, *from that point on, was there any more reference in your conversations with the defendant about an attorney?*

"A *No, there was not.*" (Emphasis supplied.)

█ The law is clear as to the procedure to be followed if an in-custody defendant requests an attorney:

"Once warnings have been given, the subsequent procedure is clear. \* \* \* If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. \* \* \*" *Miranda v. Arizona,* 384 US 436, 473-74, 86 S Ct ·1602, 16 L Ed 2d 694, 10 ALR3d 974 (1966).

Here defendant requested an attorney at least three and possibly four times, but the policeman, instead of ceasing to question, continued his interrogation without the presence of counsel. This is patently impermissible under *Miranda. State v. Freeman,* 5 Or App 372, 375, 484 P2d 867 (1971), cited by the state in support of its position that defendant waived his right to counsel, is inapposite. There the Oregon officers were never advised that defendant desired counsel before answering questions. In the present case the

officer, using less than subtle forms of inducement and persistent persuasion① and in spite of defendant's repeated requests for an attorney, finally succeeded in getting the defendant to answer questions in the absence of counsel. This is exactly the kind of conduct *Miranda* was intended to prevent. The motion to suppress should have been allowed.

In connection with the second assignment of error, the refusal of the court to instruct on the lesser included offense of negligent homicide, which carries a maximum penalty of five years, we hold, too, to be error.

Criminally negligent homicide is defined as follows:

ORS 163.145 (1):

"A person commits the crime of criminally negligent homicide when, with criminal negligence, he causes the death of another person."

ORS 161.085:

"As used in chapter 743, Oregon Laws 1971, unless the context requires otherwise:
"* * * * *

"(10) 'Criminal negligence' or 'criminally negligent,' when used with respect to a result or to a circumstance described by a statute defining an offense, means that a person fails to be aware of a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

---

① "Unless you have something to hide * * * I can't see that it would be necessary for you to have an attorney, if you are innocent * * * there is nothing that he [an attorney] could do for you that we [the police] could not do."

The Commentary to the Proposed Oregon Criminal Code which was adopted by the 1971 legislature defines what was conceived to be the distinction between manslaughter and criminally negligent homicide. The question which must be answered in distinguishing manslaughter from criminally negligent homicide "is whether [under ORS 163.125, manslaughter] the lawful act resulting in death was performed in a manner which recklessly created a substantial and unjustifiable homicidal risk or under * * * [ORS 163.145, criminally negligent homicide] whether the performance of the lawful act created a criminally negligent degree of risk which might result in conviction for criminally negligent homicide." Commentary, Proposed Oregon Criminal Code Final Draft and Report 90, Art 10, § 89 (July 1970).

A defendant is entitled to have his theory of the case presented to the jury if there is evidence to support such theory. *State v. Newlin,* 92 Or 589, 182 P 133 (1919). Thus, if there is evidence to support it, an instruction on a lesser included offense should be given if requested. *See State v. Miller,* 2 Or App 353, 358, 467 P2d 683, Sup Ct *review denied* (1970), citing *State v. Kendrick,* 239 Or 512, 518-19, 398 P2d 471 (1965).

In the present case there was evidence from which the jury could have concluded that the defendant, in lawfully struggling with his wife for the gun, either recklessly created a substantial and unjustifiable homicidal risk (as the jury did conclude) or that defendant's conduct, in lawfully struggling for the gun, created a criminally negligent degree of risk, for which defendant would have been guilty of criminally negligent homicide. Since there was evidence from

which either conclusion could have been drawn and since an instruction on the lesser included offense of criminally negligent homicide was requested, it was error to have failed to give it.

Reversed and remanded.