Argued January 17, reversed and remanded for a
new trial March 3, 1975

STATE OF OREGON, *Respondent, v.* VINSON
EMETT MATTHEWS (No. 74-58 C), *Appellant.*
532 P2d 250

*Robert C. Cannon,* Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

*Thomas H. Denney,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before SCHWAB, Chief Judge, and FOLEY and FORT, Judges.

FOLEY, J.

Defendant, 68, was charged with reckless murder. ORS 163.115(1)(b). He entered a plea of not guilty and filed notice with the circuit court of his intent to rely upon the affirmative defense that at the time of the conduct charged, as a result of mental disease or defect, he lacked "substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." ORS 161.295(1).

After a trial by jury, defendant was found guilty of the crime of manslaughter and received a 10-year sentence. He appeals, asserting that the trial court erred in excluding certain expert testimony regarding defendant's mental capacity while intoxicated and erred in failing to give a particular, requested instruction.

The facts need only be partially recited here. Defendant admits in his brief that there is sufficient

circumstantial evidence for the jury to have concluded that on April 12, 1974, defendant recklessly stabbed the victim, causing her death. Additionally, testimony established that a sample of defendant's blood, taken two hours after the incident, had an alcohol level of .11 percent.

Defendant assigns as error the exclusion of certain testimony by Dr. Mary Simpson. In order to consider this issue, a discussion of prior testimony is necessary.

Dr. Guy Parvaresh, an associate clinical professor of psychiatry at the University of Oregon Medical School, called as a witness for defendant, first testified, as an expert witness, that he diagnosed defendant as having moderate "organic brain syndrome," also known as organic brain disease, a type of psychiatric disorder in which one "has a disturbance of thought or concrete thinking, unstable affect, poor memory and poor perception of what is happening in the immediate environment." Dr. Parvaresh's testimony continued as follows:

"Q. [By Defense Counsel:] And in line with our legal definition, do you have an opinion as to the mental condition of Mr. Matthews at the time of this particular incident?

"A. Well, I have to assume one thing that was provided to me, and that was the blood alcohol level of .11 having been taken some two hours afterwards, when, if we can consider the excretion of alcohol from the kidneys, that if a blood alcohol after two hours, after the last drink was taken, was .11, then most likely at the height of the drinking their level would probably be in the neighborhood of .15, which is way beyond the legal definition of drunkenness.

"Number two, we do know that organic brain

disease, individuals cannot handle alcohol, in fact, this is one of the criteria in followup here for organic brain disease, that individuals under no circumstances should consume alcoholic beverages, because they just can't tolerate it; they can't handle it. If I were to assume that Mr. Matthews at the time had, in fact, had enough alcohol in his system that his level some two hours afterwards was .11, then my opinion would be that he at the time the crime took place, he lacked the substantial capacity required to assess what he is doing, what is happening around him, or having the ability to maintain and control his behavior required of him.

"Q. Would [he] lack substantial capacity to understand the criminality of his act or to conform his conduct to the requirements of law?

"A. Yes, assuming those factors, it would be my opinion that he did lack substantial capacity."

Dr. Parvaresh further testified under cross-examination:

"Q. [By District Attorney:] Now, assume that you are correct in your examination and your opinion, would this mental disease that Mr. Matthews has by itself render him incapable of appreciating the criminality of his act on the day this crime happened?

"A. Not as a rule.

"Q. Would this mental disease that you believe Mr. Matthews has render him incapable of conforming his conduct to the requirements of the law by itself?

"A. Without the alcohol?

"Q. Without the alcohol.

"A. No.

"Q. So, really, what you are saying is this, if I am correct, if Mr. Matthews would not have been drinking to the extent he was on this date, he would not have been incapable of appreciating his crim-

inality, [and] he would not have been incapable of conforming his conduct.

"A. It would have been very unlikely.

"* * * * *

"Q. Let me get the legal definition so I can ask you correctly.

"Now, assuming all of your examination was made and assuming the information you have, but assuming that Mr. Matthews had nothing to drink on this date, just leaving the alcohol out of it, in your opinion because of the mental disease, did he lack substantial capacity to appreciate the criminality of his conduct?

"A. It would have been unlikely that he would have lacked that substantial capacity.

"Q. Would he have lacked substantial capacity to conform his conduct to the requirements of the law?

"A. No."

Testimony by Dr. Parvaresh thus distinguished between defendant's capacity while intoxicated and defendant's capacity while not intoxicated. Further testimony developed as follows:

(Redirect examination)

"Q. [By Defense Counsel:] A person who has organic brain damage who drinks alcohol does that person do it of his own volition?

"A. No, organic brain disease, one of the most damaging problems of organic brain disease is diminished judgment * * * [W]ith the moderate degree organic brain disease, the drinking is an automatic process; in other words, a person really doesn't have much control whether he should drink or shouldn't drink * * * [T]herefore the question of voluntary intake of alcohol for a person with organic brain disease, it is well known that this is an involuntary process."

(Re-cross examination)

"Q. [By District Attorney:] Are you saying he couldn't control how much he drinks or he can't control that he drinks?

"A. Well, both processes, the fact that he shouldn't drink because he has organic brain disease and the fact that the blood alcohol level was .11.

"* * * * *

"Q. Now, voluntary act is defined as a body movement performed [consciously]. Are you saying that Mr. Matthews was not [consciously] aware that he was drinking alcohol when he was drinking it?

"A. Well, sure he was aware he is drinking, the fact that he shouldn't drink and he shouldn't drink excessively is not a voluntary and conscious decision on his part; in other words, I [can] make that decision. I don't have organic brain disease. My doctor says, 'Don't eat meat because it is not good for you.' I can make that decision, but if I had organic brain disease I wouldn't be able to make that decision. * * *

"* * * * *

"Q. What you are talking about is self control as opposed to a [conscious] decision.

"A. Well, I don't know how I can separate them, though, it is when I say voluntary act, it means that a person has enough mental capacity to make that decision and do it a reasonable way. Should you do it or shouldn't, but you lose that control; what I do is not on my own volition."

Defendant, via expert testimony, was attempting to show that defendant's mental condition was such that his intoxication was involuntary rather than voluntary and that the intoxication, combined with defendant's mental condition, resulted in a lack of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

It is in this context that we examine defendant's assignment of error relating to the exclusion of certain portions of testimony by Dr. Simpson.

Dr. Simpson, a clinical psychologist in the security section at the Oregon State Hospital, testified as to the tests she gave defendant. Portions of her testimony developed as follows:

"Q.   [By Defense Counsel:] * * * Doctor * * * based upon [the] tests that you administered, did you arrive at a conclusion as to Mr. Matthews' mental condition?

"A.   I did.

"Q.   And what was that conclusion?

"A.   That Mr. Matthews has a moderate amount of brain damage * * *.

"Q.   Would this organic brain damage, would another term be organic brain syndrome?

"A.   Right.

"Q.   Would this have been present on April 12, of 1974?

"A.   Yes.

"Q.   Is this a condition long standing?

"A.   Yes.

"* * * * *

"Q.   * * * Doctor, assume that there is testimony that would tend to indicate that a man similar to the one that you have examined and of the same age and general personality background believed that, or heard voices talking about him and saw a person carrying a hatchet at various times throughout the day, prior to the happening of this incident and made this man believe that he was in danger from the man with the hatchet, but all the other testimony of persons who were in a similar area, including the man who was supposed to have the hatchet, would tend to indicate that no such thing happened, would that person be at that point just

prior to the incident involved in this case, and you read the reports, and so you know what incident we are talking about, be unequivocably emotionally disturbed by virtue of this organic brain damage?

"A.   I think I would say yes. I am sure I would say yes.

"Q.   And if you added, if you added another fact into this, this little factor, if this person had a blood alcohol content some two hours after the act, and he did not consume any alcohol during those two hours, and he had a blood alcohol content of .11 two hours after, now would that person now with the added alcohol be able to conform his conduct to the requirements of the law?

"[District Attorney]: Your Honor, I would object because the law says that it has to be caused by a mental disease and does not say that it is mental disease in alcohol, so the answer is irrelevant."

The objection was sustained, whereupon the following testimony was given as part of an offer of proof while the jury was absent:

"Q.   [By Defense Counsel:] * * * * *

"Now, we are using the same hypothetical question involving the same man and the same blood alcohol level and the same organic condition and same factors surrounding the incident immediately prior to the murder, the same man, would this man lack substantial capacity, all of those factors included, to conform his conduct to the requirements of law on April 12, 1974?

"A.   Yes.

"* * * * *

"Q.   Well, I will ask you to assume, I will give you that fact, I will ask you to assume that at the time of the murder, assume this to be true, that the blood level, blood level was .015 milligrams per 100 weight, now, you assume that to be true, and don't worry about the blood level of alcohol,

now, taking all of those factors and assume that to be true, the addition of the blood alcohol level being 15.

"A. Okay. Now, we are back to appreciating the criminality of his conduct?

"Q. Appreciating the criminality of his conduct.

"A. I think he could appreciate that.

"Q. All right. It is just that we have this clear here, as I understand it, then, you are of the opinion that using the same man in both tests, that he has substantial capacity to appreciate the criminality of his conduct, but on the other hand he lacks substantial capacity to conform his conduct to the requirements of law.

"A. Uh huh.

"[Defense Counsel]: That would be our offer of proof, your Honor, and we would ask to be permitted to go through those same questions before the jury.

"THE COURT: The previous ruling will still hold."

The state argues that the objection to the above stated question was properly sustained because defendant could not raise a defense based upon voluntary intoxication. This begs the issue, however, for defendant had already presented testimony from which a jury could conclude that defendant's intoxication was involuntary. Defendant's argument was two-tiered: because of his moderate organic brain damage, he claimed his intoxication was involuntary; his involuntary intoxication, when combined with his moderate organic brain damage, allegedly resulted in a lack of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. Dr. Parvaresh thought defendant lacked both capacities at the time of the killing; Dr.

Simpson thought defendant lacked only the latter capacity. If either alternative were accepted by the jury, defendant's affirmative defense would have been successful.

■ Whether or not a jury would accept the theory offered by defendant, the expert testimony was relevant to the extent that it relied upon the concept of involuntary intoxication. While the legislature in ORS 161.295 altered the long-time-in-effect "M'Naghten Rule," the following language from former cases is still pertinent.

> "The line of demarcation between sanity and insanity is so indistinct, in some instances, that it is difficult accurately to de determined even by a physician. * * *" *State v. Roselair,* 57 Or 8, 12-13, 109 P 865 (1910).

Here, the offered testimony represented the essence of defendant's case. As the Oregon Supreme Court has stated:

> "* * * Insanity is an elusive concept. * * * With the issue and the evidence incapable of precise measurement, any finding on any aspect of the defendant's mental condition would be relevant and of assistance to the jury in reaching its most difficult decision." *State v. Gilmore,* 242 Or 463, 465-66, 410 P2d 240 (1966).

■ We hold that the offered testimony, in the context in which it was presented, was relevant and it was error to sustain the objection to the testimony.

Three expert witnesses testified. One, Dr. Parvaresh, was permitted to testify that he thought defendant fulfilled both of the mental disease or defect alternatives of ORS 161.295(1) at the time of the killing. Another, Dr. Raymond Weissert, testified on behalf of the state that he thought defendant fulfilled

neither of the alternatives. With the issue so closely divided, we cannot say the jury would not have been influenced in arriving at its verdict by Dr. Simpson's testimony that she thought defendant, at the time of the killing, fell within one of the two alternative theories of the statute. We therefore cannot hold that the exclusion of part of Dr. Simpson's testimony was harmless error.

■ Defendant next assigns as error the failure to give a requested instruction relating to "mental disease or defect *brought about by intoxication, whether or not such intoxication was voluntary * * *.*" (Emphasis supplied.) Defendant relies upon *State v. Smith,* 260 Or 349, 490 P2d 1262 (1971). However, the requested instruction ignored significant distinctions noted in *Smith,* particularly regarding involuntary as opposed to voluntary intoxication and short-term as opposed to long-term effects of intoxication. The trial court is not obliged to give an incorrect instruction, *Owings v. Rose',* 262 Or 247, 497 P2d 1183 (1972), *overruled on other grounds, U.S. Fire Ins. Co. v. Chrysler Motors,* 264 Or 362, 366, 505 P2d 1137 (1973), thus failure to give the instruction was not error.

Reversed and remanded for new trial.

SCHWAB, C. J., specially concurring.

Whether Dr. Simpson's excluded testimony was, as the district attorney claimed, "irrelevant," and whether defendant's requested instruction was proper in form raises the following question: To what extent does evidence of intoxication tend to prove the existence of a "mental disease or defect" within the meaning of ORS 161.295(1), the statute defining the insanity defense. In discussing this question the majority states that there are significant distinctions between the

short-term and long-term effects of intoxication, and between voluntary and involuntary intoxication.[1]  I am unable to join that portion of the majority opinion.

As I read *State v. Smith*, 260 Or 349, 490 P2d 1262 (1971), and the cases cited therein, it is clear that intoxication can in at least some situations be relevant to an insanity defense.[2]  Exactly when intoxication is relevant is less clear. *Smith* states at one point that "voluntary intoxication is * * * a defense * * * if it produces insanity." 260 Or at 353, n 2. At another point *Smith* refers to "a distinction between the effects of temporary intoxication and the long-term effects of extended or gross intoxication." 260 Or at 352. There is yet another reference to "excessive and long-continued use of intoxicants." 260 Or at 352-53. The analysis in *Smith* concludes, "insanity caused by in-

---

[1] The majority does not define "voluntary" or "involuntary" intoxication. ORS 161.085(2) defines a "voluntary act" as "a bodily movement performed consciously." Obviously the district attorney's cross-examination of Dr. Parvaresh, quoted by the majority, was based in part on this statute. However, I doubt that this statutory definition was intended to apply to intoxication. If it does apply, involuntary intoxication is probably quite rare. But in any event, if we are going to hold that there are significant distinctions between voluntary and involuntary intoxication, it seems to me that some effort should be made to define these concepts.

[2] At the time State v. Smith, 260 Or 349, 490 P2d 1262 (1971), was decided, Oregon followed the "M'Naghten" insanity test. This has since been replaced by the Model Penal Code test enacted as ORS 161.295 in 1973. One component of the new test is that the defendant had a "mental disease or defect." There is no statutory definition of this phrase, and the Criminal Law Revision Commission intended that it be subject to case law definition and development. *See,* Proposed Oregon Criminal Code (Prelim. Draft No. 4, 1968), Commentary at p 3, cited and discussed in *Comment,* 52 Or L Rev 285, 288-89 (1973). Accordingly, I assume that Oregon Supreme Court decisions on what can produce insanity, such as *Smith,* are controlling in this court on what can produce mental disease or defect unless and until the Supreme Court chooses to reconsider the matter.

toxication [is] the same as insanity brought about by any other cause." 260 Or at 353.

Parts of *Smith* seem to indicate that any intoxication, regardless of whether voluntary/involuntary or long-term/short-term, can be evidence of insanity, or more precisely, mental disease or defect. Other parts of *Smith* seem to indicate, as the majority states, that there may be significant distinctions between kinds and durations of intoxication.

In light of this uncertainty, I favor a narrow holding in this case. I would only hold that the evidence in this case—that defendant had an organic brain syndrome, that this impaired his ability to control his consumption of alcohol, and that defendant was intoxicated at the time of the homicide—was such that defendant's intoxication was relevant to his insanity defense under *Smith*.[9] It follows that Dr. Simpson's testimony was admissible, and that the trial court should have instructed the jury that intoxication could be considered in determining whether defendant had a mental disease or defect at the time of the homicide.

I think it better to leave for another day the broader questions of if and when different kinds or durations of intoxication would produce a different result under *Smith*.

---

[9] It is difficult to appreciate the timing of the district attorney's objection that evidence of intoxication was "irrelevant" to defendant's insanity defense. During Dr. Parvaresh's testimony the district attorney not only failed to object to testimony about intoxication, but also questioned at length on this subject during cross-examination. Having actively participated in opening this door, it seems it was a little late to try to close it when Dr. Simpson was later called to the stand and asked substantially the same questions Dr. Parvaresh had previously answered without objection.