Argued November 16, 1977, affirmed February 7, reconsideration denied May 3, review allowed July 25, 1978, 283 Or 99

STATE OF OREGON, *Respondent,*

*v.*

ANTONIO MIGUEL HERRERA, *Appellant.*

(No. 76-278 C, CA 7539)

574 P2d 1130

Peter Robinson, Certified Law Student, Portland, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

John W. Burgess, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, and Al J. Laue, Solicitor General, Salem.

Before Schwab, Chief Judge, and Lee and Joseph, Judges.

LEE, J.

**LEE, J.**

Defendant appeals his conviction of murder. ORS 163.115.[1] Defendant urges that (1) the court abused its discretion in denying his motion for a change of venue, ORS 131.363; (2) the court erred in permitting an accomplice's preliminary hearing testimony to be read to the jury under ORS 41.900(8) in violation of the confrontation clauses of the Oregon[2] and United States[3] Constitutions; and (3) the court erred in failing to give defendant's requested instruction regarding mental disease or defect based upon ORS 161.295. We affirm.

On July 19, 1976, the body of Samuel Newman was discovered lying in a street. He had died from multiple stab wounds. On July 24, 1976, defendant was arrested in connection with the stabbing. That day defendant told police two conflicting stories about his activities on the night Newman was stabbed. Defendant did not rely on the first story at trial so it does not bear repeating. Defendant's second story was that Newman had been hitchhiking when he and the Lerma brothers, Steve and Phil, picked him up.

---

[1] ORS 163.115 provides:

"(1) Except as provided in ORS 163.118 and 163.125, criminal homicide constitutes murder when:

"(a) It is committed intentionally by a person who is not under the influence of an extreme emotional disturbance; or

"(b) It is committed by a person, acting either alone or with one or more persons, who commits or attempts to commit arson in the first degree, burglary in the first degree, escape in the first degree, kidnapping in the first degree, rape in the first degree, robbery in any degree or sodomy in the first degree and in the course of and in furtherance of the crime he is committing or attempting to commit, or the immediate flight therefrom, he, or another participant if there be any, causes the death of a person other than one of the participants.

"* * * * *."

[2] Or Const, Art I, § 11, provides in part:

"In all criminal prosecutions, the accused shall have the right * * * to meet the witnesses face to face * * *."

[3] US Const, Amend VI, provides in part:

"In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *."

Defendant said that he was driving and Phil was in the back seat. Newman called Phil some bad names and Phil stabbed him to death. Defendant tried to stop Phil and was cut over the right eye. Newman's body was then dumped. After talking to defendant, Phil told police essentially the same story.

On the same day, Steve told the police that he had been driving when defendant placed a knife at Newman's throat and initiated the stabbing in which Phil participated. Steve was granted immunity from prosecution on the condition that, among other things, he did not participate in robbery or any other felony. On September first and second, Steve repeated his story under oath at a preliminary hearing which involved extensive cross-examination by defendant's attorney. At the hearing Steve also testified that he had agreed to rob someone before the killing occurred.

Prior to the trial, the local news media reported the content of Steve's testimony implicating defendant and Phil as suspects. The newspapers also reported that the district attorney had revealed that a signed confession existed. Defendant moved for a change of venue. A pretrial hearing was conducted and the court denied the motion.

On the last business day before trial, the prosecution revoked Steve's conditional immunity and charged him with felony murder of Newman based upon his testimony at the preliminary hearing. At defendant's trial Steve refused to testify on the ground that it might incriminate him. Over objection, the prosecution read Steve's preliminary hearing testimony to the jury.

At trial defendant testified that he had taken several drugs on the evening of the homicide and that he had been taking different types of drugs pretty regularly for the last six years. Defendant was 17 at the time of his apprehension and was remanded to adult court for trial. A psychiatrist testified that many regular amphetamine users become assaultive and

that multiple stab wounds would indicate such a temperament. The psychiatrist further testified that a chronic amphetamine user who had injected amphetamines into his system a few hours earlier would probably know what he was doing while stabbing someone but that his ability to conform to the law would be lacking. The trial judge refused to instruct the jury regarding the defense of mental disease or defect, ORS 161.295.

## VENUE

Defendant contends that the court abused its discretion in denying his motion for a change of venue based upon ORS 131.363[4] which provides:

> "For the convenience of parties and witnesses, and in the interest of justice, the court, upon motion of the defendant, may order the place of trial to be changed to another county."

During a pretrial hearing defendant introduced newspaper articles which reported that police said defendant initiated the stabbing and that the district attorney said one of the defendants had signed a confession.[5] To counter this motion the prosecution called upon eight members of the community to testify regarding the newspaper articles.[6] These people were not told the name of the case or the reason for their testimony. Upon examination, most of the witnesses

---

[4]Defendant did not cite ORS 131.355 in support of his motion although it was framed in terms of "prejudice" and argued as such based upon newspaper coverage of the incident.

[5]The newspaper articles reported that the district attorney revealed the names of the suspects and said one of the defendants had signed a confession. It is contrary to Disciplinary Rule 7-107 (B) of the Code of Professional Responsibility for a lawyer to make any extrajudicial public statements, from the time of arrest until the trial, relating to: the existence of any confession, admission or statement given by the accused; and the identity, testimony or credibility of a prospective witness. Oregon State Bar, Code of Professional Responsibility, Cannon 7, DR 7-107 (B) (3), (5).

[6]ABA "Standards for Granting the Motion," § 3.2(c) suggests that qualified surveys, *opinion testimony offered by individuals,* or court evaluation of the nature, timing and frequency of the material are methods for determining when there is a reasonable likelihood that, in the absence of a change of venue, a fair trial cannot be had.

[ 401 ]

were aware of the killing but could not recall that they had been informed that defendant was connected with it. Only one witness could remember that the defendant was "supposed" to have done it and he wasn't sure how he acquired that information. On the basis of the evidence presented the trial judge denied the motion.

In general, motions for change of venue are addressed to the sound discretion of the trial court. *State v. Little,* 249 Or 297, 312, 431 P2d 810, *cert den* 390 US 955 (1968). In exercising its discretion, the trial court should grant a change of venue where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial. In addition, appellate courts have the duty to make an independent evaluation of the circumstances in determining whether the trial court has taken sufficient measures to assure that an accused is tried by impartial jury free from outside influences. *Sheppard v. Maxwell,* 384 US 333, 363, 86 S Ct 1507, 16 L Ed 2d 600 (1966).

In this case the newspaper articles did report the suspects' names, specific details of the crime, and the existence of a confession. We have given consideration to all of the evidence adduced at the change of venue hearing and we cannot say that the press coverage of the crime was so pervasive that it was an abuse of discretion to deny the change of venue. *Cf. State v. Wampler,* 30 Or App 931, 569 P2d 46 (1977), *rev den* (1978).

## CONFRONTATION

Defendant next contends that the court erred in admitting hearsay testimony under ORS 41.900(8) in violation of defendant's rights under the confrontation clauses of the Oregon and United States Constitutions. This issue arose when Steve's "conditional immunity agreement"[7] was revoked and he claimed his right

---

[7]We note that the "conditional immunity agreement" in issue was not the result of a court order as authorized by ORS 136.619; it was only an agreement by the state to refrain from prosecution upon specific conditions in exchange for testimony.

against self-incrimination. When this occurred, testimony from the preliminary hearing was read into evidence. The conflict arises because defendant's right to confront the witness is seemingly inconsistent with the witness's constitutional privilege against self-incrimination.

■   The right of confrontation given by the Oregon Constitution is a guaranty that an accused shall have the right to meet his own witnesses face to face, to cross-examine those adverse to him, and to examine them orally in the presence of the court and jury. However, this right does not do away with the established exceptions of the confrontation rule. *State ex rel. Gladden v. Lonergan,* 201 Or 163, 176, 177, 269 P2d 491 (1954); Or Const, Art I, § 11.

■   One exception to the defendant's right of confrontation is that the former testimony of a witness may be admissible, when necessary, where the opportunity of cross-examination has been afforded. *State ex rel. Gladden, supra* at 180. Such necessity may arise when a witness becomes unavailable.[8]

■■   In this case Steve became unavailable when he claimed his privilege and his prior testimony was admitted pursuant to ORS 41.900(8) which provides:

"Evidence may be given of the following facts:
"* * * * *

"(8) The testimony of a witness, deceased or, out of state, or unable to testify, given in a former action, suit, or proceeding, or trial thereof, between the same parties, relating to the same matter."

This statute was construed in *State v. Rawls,* 252 Or 556, 562, 451 P2d 127 (1969), to include the common law rule that former testimony which was given in a

---

[8]This conclusion is required by *State v. Rawls,* 252 Or 556, 451 P2d 127 (1969), where a witness became unavailable by claiming his privilege against self-incrimination and his former testimony was admitted under the unavailablity statute. It seems that necessity arises when a witness invokes his constitutional right but not when the offering party simply fails to obtain the physical presence of a witness. *Cf. State ex rel. Gladden v. Lonergan,* 201 Or 163, 176, 269 P2d 491 (1954).

previous trial may be used at a subsequent trial when the witness is no longer available. However, a witness must not go beyond the process of the court by the procurement or instigation of the offering party. *Rogers v. Donovan,* 268 Or 24, 27, 518 P2d 1306 (1974). Thus defendant contends that the state loses its right to read a witness's prior testimony at a subsequent trial after the state has revoked its "conditional immunity agreement" and indirectly caused his unavailability.

Assuming, arguendo, that the conditional immunity agreement was valid, the state may revoke it and charge the witness with commission of a crime when the state has "good reason"[9] to believe that the witness committed a crime and therefore breached a condition of the agreement.[10] Although such revocation may indirectly cause a witness to invoke his privilege against self-incrimination,[11] the state's revocation of the immunity agreement was not the ultimate cause of the witness's unavailability—instead, it was the witness's exercise of his privilege that created the unavailability. The privilege against self-incrimination belongs to the witness alone and is beyond the control of either defendant or the state. US Const, Amend V; *State v. Inman,* 8 Or App 180, 492 P2d 804, Sup Ct *rev den* (1972).

█ It is well settled that testimony from a prior *trial* in

---

[9]ORS 132.330 provides:

"The district attorney may submit an indictment to the grand jury in any case when he has good reason to believe that a crime has been committed which is triable within the county."

[10]Since Steve testified during the preliminary hearing that he had agreed to rob someone, Steve violated a condition of his immunity that "he did *not* participate in a plan, * * * robbery or any other felony which indirectly resulted in the death * * *." (Emphasis supplied.)

[11]It is questionable whether the state's decision to charge the witness with felony murder on the basis of his preliminary hearing testimony should affect whether the witness claims the privilege during Herrera's trial because, regardless of the Herrera trial, the state will be able to put the witness's preliminary hearing testimony into evidence as an admission at his subsequent trial.

which defendant had an opportunity to conduct cross-examination may be read at trial without denying defendant the right to be confronted by the witness. *State v. Rawls, supra* at 561. We hold that a witness's testimony at a preliminary hearing sufficiently approximates the circumstances of a trial if, as in this case, (1) it is given under oath; (2) the witness is subject to cross-examination by defendant's counsel; and (3) the proceedings are recorded by a judicial tribunal. *California v. Green,* 399 US 49, 165, 90 S Ct 1930, 26 L Ed 2d 489 (1970). The prior testimony was, therefore, properly admitted.

## MENTAL DISEASE OR DEFECT

Defendant's third contention is that the court erred in refusing to give defendant's requested instruction on mental disease or defect to the jury.[12] Defendant's instruction was based upon ORS 161.295(1) which provides:

"(1) A person is not responsible for criminal conduct if at the time of such conduct as *a result of mental disease or defect* he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (Emphasis supplied.)

Defendant testified that he had taken amphetamines frequently over the past six years commencing at the age of eleven years and that he had also used many "downers".[13] He did not testify that he was addicted to drugs, nor did he claim an inability to conform his conduct to the requirements of the law. He did, however, testify that his memory was hazy as to the events on the night of the stabbing and that he had blacked out.

■ Defendant's psychiatrist discussed the effect that chronic amphetamine usage can have on a subject's mind. He stated that prolonged use of amphetamines

---

[12]The court did give defendant's instruction that intoxication or drug use may negate an element of the crime charged.

[13]"Downers" is a term used to describe sedatives.

can cause "wasting"[14] of cells and assaultive behavior but that each individual would react differently. He further testified that a chronic amphetamine user who had injected amphetamines into his body a few hours earlier would subsequently know what he was doing but would not have the capacity to conform his conduct to the requirements of the law. The trial judge refused to instruct the jury on the issue of "mental disease or defect." Thus, the issue is whether such evidence of drug use and its possible effect on an individual is sufficient, as a matter of law, to require the court to instruct the jury on that defense.

Defendant is entitled to have his theory of the case presented to the jury if there is evidence to support it. *State v. Suggs,* 13 Or App 484, 491, 511 P2d 405 (1973). However, if the testimony offered by defendant is not sufficient to establish the defense of mental disease or defect, it is permissible to omit such an instruction. *State v. Green,* 271 Or 153, 175, 531 P2d 245 (1975); *State v. Matthews,* 20 Or App 466, 532 P2d 250 (1975).

Upon reviewing the evidence for sufficiency, we find it inadequate in several respects. At best, the psychiatrist's testimony amounts to an assertion that a chronic amphetamine user, who received an injection a few hours earlier, might lack the substantial capacity to conform his conduct to the requirements of the law. The psychiatrist did not testify that a mental disease or defect had caused defendant's lack of capacity to conform; rather, he testified that amphetamine use could cause a lack of capacity to conform. Apparently defendant contends that evidence of an inability to conform one's conduct constitutes evidence of mental disease or defect. This reasoning puts the cart before the horse. The statute clearly requires that defendant's lack of capacity to conform be the *result* of a mental disease or defect. ORS 161.295.

---

[14]"Wasting" is a process of physical deterioration.

*State v. DePue,* 18 Or App 158, 524 P2d 562, Sup Ct *rev den* (1974), provides a good example of evidence which raises the defense of mental disease or defect. In that case a psychiatrist testified that amphetamine use had caused organic thought disorders and a state of psychosis in the defendant which in turn caused the defendant to lose his ability to restrain himself. Thus the testimony provided evidence that the defendant suffered from a mental disease or defect which caused his inability to conform his conduct.

The second problem with the testimony in the instant case is that it fails to make significant distinctions between involuntary and voluntary intoxication and between short-term and long-term effects of intoxication.[15] *See, State v. Smith,* 260 Or 349, 351, 490 P2d 1262 (1971); and *State v. Matthews, supra.* Instead, the expert assumed the existence of a chronic amphetamine user *who had just injected more amphetamines* when he assessed the user's ability to conform his conduct. These distinctions are crucial when the insanity defense is raised because that defense touches the heart of our criminal justice system in that it determines when society will hold a person responsible or nonresponsible for his acts.[16]

In view of the abovementioned inadequacies, we hold that the evidence in this case was insufficient to raise the defense of mental disease or defect under ORS 161.295.

Affirmed.

**SCHWAB, C. J.,** specially concurring.

I take a different route to the same result on the issues of: (I) whether defendant's requested insanity

---

[15] In this context intoxication refers to that state caused not only by alcohol but all drugs.

We find no support for defendant's contention that peer pressure may have caused the defendant to act involuntarily.

[16] *Cf. State v. Tyler,* 77 Wash 2d 726, 466 P2d 120, 129 (1970).

instruction should have been given; and (II) the admissibility of Steve Lerma's prior testimony.

## I

The jury would have been entitled to conclude from the testimony of the defense psychiatrist that defendant was addicted to amphetamine which, combined with his fear of withdrawal, diminished his ability to think clearly, make reasoned judgments and control his assaultive impulses. The jury would have been entitled to find persuasive the psychiatrist's opinion that these conditions rendered defendant unable to conform his conduct to the requirements of the law.

The majority seems to be weighing the probative value of this evidence. I decline to thus invade the province of the jury. The legal question before us is whether this evidence is minimally sufficient to require an instruction on "insanity" in accordance with ORS 161.295. I think it is *if* drug addiction can ever be a "mental disease or defect" within the meaning of ORS 161.295.

ORS 161.295 was derived from Model Penal Code, § 4.01. Proposed Oregon Criminal Code 34-7, Commentary, § 36 (1970). Annotation, 73 ALR3d 16, 23, 60-4 (1976), points out that, in jurisdictions that have adopted the Model Penal Code "insanity" test, the courts have consistently held or assumed that drug addiction can be a "mental disease or defect." This body of authority cogently supports the argument that an "insanity" instruction should have been given in this case.

However, the Oregon legislature is entitled to define as it sees fit the statutory phrase "mental disease or defect." And I conclude it has done so in such a way as to exclude the possibility of drug addiction ever being a "mental disease or defect" within the meaning of ORS 161.295.

Oregon Laws 1973, ch 697, § 2, p 1581, provides:

> "The Legislative Assembly finds drug dependence is an illness. The drug-dependent person is ill and shall be afforded treatment for his illness."[1]

Other parts of Oregon Laws, ch 697, e.g., § 18, make it clear that the legislature was using "drug dependency" as a synonym for "drug addiction." This statute, standing alone, supports the idea that drug dependency/addiction can be a mental disease or defect for criminal law purposes. However, in the same Act the legislature provided that drug dependence was, for criminal law purposes, to be dealt with the same as voluntary intoxication. Specifically, Oregon Laws 1973, ch 697, § 13, p 1586, amended ORS 161.125 by, among other things, adding the emphasized language:

> "(1) *Drug use, dependence on drugs* or voluntary intoxication shall not, as such, constitute a defense to a criminal charge, but in any prosecution for an offense, evidence that the defendant *used drugs, or was dependent on drugs,* or was intoxicated may be offered by the defendant whenever it is relevant to negative an element of the crime charged.
>
> "(2) When recklessness establishes an element of the offense, if the defendant, due to *drug use, dependence on drugs* or voluntary intoxication, is unaware of a risk of which he would have been aware had he been not intoxicated, not using drugs, or not drug dependent, such unawareness is immaterial." (Emphasis supplied.)

I leave for others the task of explaining the rationale of treating drug addiction, which by definition suggests an element of involuntariness, the same as voluntary intoxication is treated. But that is precisely the legislative fiat I perceive in Oregon Laws 1973, ch 697, p 1581. I conclude that drug addiction can never be a "mental disease or defect" within the meaning of ORS 161.295. On this basis, rather than that adopted by the majority, I agree the trial court was correct in not giving an "insanity" instruction in this case.

---

[1] Codified as ORS 430.415.

## II

Defendant's hearsay and confrontation contentions present substantially the same issue. On the present facts, Steve Lerma's prior testimony was admissible over a hearsay objection once he asserted his Fifth Amendment privilege *if the prosecution did not cause Lerma's testimony to be unavailable at defendant's trial. Rogers v. Donovan,* 268 Or 24, 518 P2d 1306 (1974). Likewise, on the present facts, Lerma's prior testimony was admissible over a confrontation objection once he asserted his Fifth Amendment privilege *if the prosecution made a good-faith effort to make Lerma's testimony available at defendant's trial. Mancusi v. Stubbs,* 408 US 204, 92 S Ct 2308, 33 L Ed 2d 293 (1972); *Barber v. Page,* 390 US 719, 88 S Ct 1318, 20 L Ed 2d 255 (1968). The caveats in the two contexts appear to me to be different ways of expressing the same concept: Did the prosecution by omission or commission produce the situation that made Lerma's testimony unavailable at defendant's trial?

There is a serious argument that it did. The "conditional immunity agreement" was executed by Steve Lerma, his attorney and a deputy district attorney on August 2, 1976. Lerma testified at defendant's preliminary hearing on September 1 and 2, 1976. The prosecution revoked the "conditional immunity agreement" and initiated a felony-murder charge against Lerma on the last business day before defendant's trial began on November 29, 1976. If, as the state contends, Lerma's "immunity" was revoked because of what he said at the preliminary hearing in early September, why did it take the state until late November to effect that decision? And if the state was content to dally for almost three months, why was it not content to delay taking any action against Lerma until after defendant's trial? The record contains no answers.

I join in resolving this close question against defendant because of the nature of the "conditional immunity agreement" between Lerma and the state. I

interpret it to promise Lerma "immunity" on the condition that he committed no criminal acts. This is not a grant of immunity as contemplated by statute. *See* ORS 136.617 and 136.619. The conditioned "promise" is at best illusory.

Assuming, as I think we often must, that people generally act rationally, I cannot comprehend why Steve Lerma gave testimony at defendant's preliminary hearing that amounted to a confession that he (Lerma) had participated in a felony murder. Any claim that Lerma so testified in reasonable reliance on the "promised immunity" would simply be irrational. In other words, I think the decision confronting Lerma at that juncture would have been exactly the same had the "conditional immunity agreement" never been executed: He could testify against defendant in the hope that the would receive more favorable treatment in his own case or he could assert his Fifth Amendment privilege.

Exactly the same decision confronted Lerma at the time of defendant's trial. Just as his earlier decision to testify could not reasonably have been in reliance on the so-called "promised immunity," I fail to see how his decision at the time of trial could have been in reasonable reliance on the revocation of the so-called "promised immunity." Since the "promise" gave nothing, its revocation took nothing away. Accordingly, although I do not find the prosecution's conduct to be exactly laudable, I conclude that no act or omission of the prosecution had any reasonable or rational causal connection with the unavailability of Lerma's testimony at the time of defendant's trial.