STATE OF OREGON,
*Respondent,*

*v.*

STEVEN HARRY DANIELS,
*Appellant.*

(No. 78 3326, CA 12210)

597 P2d 1277

Gary L. Hooper, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Karen H. Green, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief was James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Schwab, Chief Judge, and Thornton, Buttler and Joseph, Judges.

THORNTON, J.

**THORNTON, J.**

Defendant appeals from his conviction for armed robbery after trial to the court. He contends that the trial court erred in the following particulars:

1) Ruling admissible defendant's inculpatory statements to the investigating officers.

2) At time of sentence, failing to specify in ordering restitution the period of time or number of instalments within which defendant had to pay $590.95 to the victim.

The essential facts may be summarized as follows:

On the night of May 21, 1978, John Schuyler was beaten and robbed by two persons in a campground near Florence on the Oregon coast. He described his assailants and told the police that they had a St. Bernard puppy.

Officer Daugherty of the Oregon State Police was advised of the crime the next morning. At approximately 7 a.m., he and Recruit Buckman contacted Officer Thallman outside a nearby motel. Thallman told Daugherty two persons with a St. Bernard puppy had checked into the motel during the morning hours. Daugherty and Buckman then proceeded to the room. Daugherty knocked on the door and announced their presence. The defendant answered, identified himself as "Bryan Russell," and stepped outside. Recruit Buckman stepped inside and asked for defendant's companion, Summerfield. Daugherty advised defendant of his *Miranda* rights (*Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974 (1966)). Defendant indicated he was willing to talk without a lawyer. In response to the officer's questions, the defendant said he and Summerfield left San Francisco the previous day and had hitchhiked north; that they arrived at the motel at approximately 12:30 a.m. and went to bed. Defendant denied using any aliases.

Defendant and Summerfield were then taken to the State Police Office in Newport and placed in separate

rooms for questioning. During questioning, defendant told Daugherty that they were en route to Seattle. At this point, Detectives McMullen and Winsor of the Lane County Sheriff's office arrived.

Daugherty left defendant and Winsor alone. Winsor then advised defendant of his rights. According to Winsor, defendant again said that he would proceed without a lawyer. When Winsor asked defendant about the incident, defendant said he knew nothing about it and that he was returning from California. Defendant then said he had "nothing else to say about the incident." Winsor indicated there was just "general conversation" from that point on, related to where defendant had been in California, and why he was going north. The questioning then ceased.

Shortly thereafter, at the request of the police, defendant and Summerfield signed cards granting consent to search their motel room. The officers then proceeded back to Florence to search the motel room. There they found a brown leather hat in defendant's back-pack which, according to Detective Winsor, had been described by the victim. They also found receipts indicating that defendant had purchased the dog at Medical Lake, Washington. Defendant stated that the hat, the receipt and the dog all belonged to him. Defendant and his companion were then taken to the Florence city jail.

On arrival at the jail, defendant and Summerfield were placed in cells approximately 35 feet apart. Thereafter, Officer McMullen had a lengthy discussion with Summerfield on the floor outside defendant's cell. The officer testified as follows: that Summerfield asked hypothetically what would happen if one person did the beating and robbing and the other person just stood by, that there was a lot of crying by Summerfield but he did not admit participation in the robbery. McMullen stated further that he believed defendant could overhear their voices but not the conversation verbatim.

[246]

Thereafter, at McMullen's suggestion, Winsor talked with Summerfield out of defendant's hearing. Following this, Winsor went to the coffee room directly across from defendant's cell. According to Winsor, as he turned to go through the doorway defendant whistled and motioned for Winsor to come to the cell. After he did so, defendant said, "Anything that Mr. Summerfield said, put it in writing and I'll sign the same thing." Winsor replied that he did not have anything and defendant said he would sign anything Summerfield signed. Winsor said Summerfield had not signed anything, that defendant then asked what Summerfield had said and that Winsor responded that he was concerned only with recovering all the money, that defendant told Winsor, "I don't have any money," and that he threw it out the front door when he saw the police coming.

Thereafter, while McMullen was standing by the coffee machine, defendant called to him, saying, "Officer, come here. I want to talk to you a minute." When McMullen entered defendant's cell, defendant volunteered the following information: he admitted his name; he said that the whole thing had been Summerfield's idea; he said the victim had picked them up near Medical Lake; he noted that the victim was carrying a large amount of money. Defendant then proceeded to describe the attack and robbery in detail, including his own participation. Subsequently, Winsor took Summerfield to the crime scene where nunchaku sticks, reported to have been used in the attack, and a wallet were picked up.

During the state's opening statement, a recess was taken to determine the admissibility of defendant's statements. Following the hearing, the trial court ruled that all statements made by defendant were admissible.

Defendant argues that all statements made after he said he had nothing else to say about the incident were inadmissible under *Miranda v. Arizona, supra; State*

[247]

*v. Turner,* 32 Or App 61, 573 P2d 326 (1978); and *State v. Rodriguez,* 37 Or App 355, 587 P2d 487 (1978), *rev den* 285 Or 319 (1979).

The trial court found that defendant continued to talk after being advised of his rights; that the officers were more credible as to the sequence of events during the day defendant was arrested and questioned; and that the statements made by defendant were voluntary and therefore admissible.

■ ■ While we are bound by the trial court's ascertainment of historical facts, *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968), we make an independent assessment of whether those facts are sufficient, as a matter of law, to indicate waiver of defendant's right to remain silent. *Cf., State v. Warner,* 284 Or 147, 585 P2d 681 (1978). Given the trial court's determination of the facts, we agree that the statements were voluntary.

Defendant was advised of his constitutional rights and was fully advised that he could cut off questioning at any time. Defendant's subsequent incriminating statements about the crime and his participation in it were initiated by defendant, were volunteered, and were not the product of unlawful coercion by the police. *Cf, State v. McGrew,* 38 Or App 493, 590 P2d 755, *rev den* (1979).

■ As to defendant's second assignment, while the sentencing order fails to meet the requirements of ORS 161.675(1), defendant failed to make timely objection as required by ORS 137.106(3). *See State v. Starn,* 37 Or App 914, 587 P2d 1031 (1978).

Affirmed.