Argued and submitted May 30,
remanded for resentencing August 25, 1980

STATE OF OREGON,
*Respondent,*

*v.*

TERRY EVERETT COX,
*Appellant.*

(No. 78-1420 C, CA 16090)

615 P2d 1144

Marianne Bottini, Deputy Public Defender, Salem, argued the cause for appellant. With her on the brief was Gary D. Babcock, Public Defender, Salem.

Robert C. Cannon, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief was James M. Brown, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Schwab, Chief Judge, and Thornton and Richardson, Judges.

RICHARDSON, J.

**RICHARDSON, J.**

Defendant appeals his conviction for murder, ORS 163.115(1), contending that his confession should not have been admitted into evidence. He also appeals the imposition of a 20-year minimum sentence.

In the course of investigating the disappearance of the victim, whose body had not as yet been located, the Josephine County District Attorney, Robert Burrows, and Deputy Sheriff Mark Dickson went to Santa Clara, California, to help the California authorities serve an arrest warrant on defendant. Burrows was acquainted with defendant and could identify him. Burrows also intended to talk to defendant about the missing person. Defendant was arrested and taken into custody. Later, in the early morning hours, Dickson and Burrows talked with defendant. Burrows advised defendant of his rights under *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974 (1966). Defendant indicated that he understood his rights. Burrows then told defendant that he was not there to play any games, that a man was missing and presumed dead, that the authorities had found the missing person's automobile and a business card with defendant's name on it, that defendant's pickup truck had been seen in the area near the automobile, and that defendant had been seen in the company of the missing person and two other men earlier on the day of the disappearance. Burrows informed defendant that they knew the missing person had been killed by being hit with a tire iron and club, that the deceased's body had been buried and then reburied, and that the vehicle used to transport the body belonged to one of the other two men. Burrows then told defendant that he was in charge of the case, that he was there specifically to talk to defendant and that he wanted defendant to give defendant's version of the facts if defendant wanted to.

Defendant replied: "[M]aybe I should get an attorney, what do you think?" At this point Burrows

told him that the decision was entirely up to defendant, that defendant had had contact with the law enforcement system and that he could not make that decision for defendant.

Defendant then began to ask Burrows questions concerning the probable length of his sentence, and the effect of his prior record. Burrows answered these questions. At this time Burrows was called out of the interview room to receive a telephone call. When he returned, he informed Dickson that the deceased's body was found and the location. He then told defendant that he would like defendant's story if he would give it.

Defendant again stated: "I think maybe I should get an attorney, Bob, what do you think, should I get an attorney, Bob?" Burrows again told defendant in no uncertain terms that he could not answer that question and that it was entirely up to defendant.

Defendant began to inquire further of Burrows as to what the two other men had said. Dickson then stated that they would not give defendant that information. Defendant asked Burrows what judge he could expect and when he would be sent back to Oregon. Burrows explained the extradition procedure to defendant, who replied that he intended to go back to Oregon with Burrows in the morning.

At this point Dickson and Burrows got up to leave and told defendant they were going to bed. Defendant grabbed Burrows' arm and asked him to stay and talk. Burrows sat down. Defendant then asked Burrows what jail he was likely to be placed in, and whether he could have visitors, a private cell, etc. Burrows answered his questions. Dickson then went out for some soft drinks and defendant asked Burrows if the other men had told Burrows that he had committed the homicide. Burrows told defendant that defendant could give them his side of the story if defendant wanted but that he would not tell defendant what the others had said. About this time Dickson

returned and Burrows said that defendant was going to talk. Defendant then asked: "Where should I start?" and proceeded to detail the facts of the murder.

Defendant seeks to suppress this confession under *Miranda,* and its progeny, claiming that the state failed to prove that he waived his right to counsel.

In this case defendant made an equivocal response to the implied question of whether he desired an attorney. Assuming that equivocal response can be considered as a request for counsel prior to any questioning and was sufficient to put the state on notice that he desired an attorney, we must determine if the discussion between defendant's response and his subsequent waiver constituted interrogation prohibited by *Miranda v. Arizona, supra.*

Recently, the Supreme Court, in *Rhode Island v. Innis,* 446 US 291, 100 S Ct 1682, 64 L Ed 2d 297 (1980), discussed what is considered interrogation for the purposes of *Miranda.* There, defendant was arrested for the shotgun murder of a taxi cab driver and was taken into custody. He was advised of his rights and asserted his right to counsel. On the way to the police station, one of the officers stated to another officer that it was too bad they couldn't find the weapon since they were near a school for the handicapped and that maybe some little girl would find the shotgun and accidently kill herself. Defendant then told the officers where the gun was located. The Supreme Court reversed the Rhode Island Supreme Court's decision to suppress on the ground that *Miranda* only prohibits further *interrogation* of a suspect who has asserted his rights, and that what occurred was not interrogation. The court concluded that the dialogue was between the police officers and no response from defendant was invited.

In defining interrogation, the Supreme Court stated:

"We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (Emphasis original.) (Footnotes omitted.) 446 US at 300-302.

■ In this instance defendant initiated the discussion, after his equivocal request for an attorney, by asking certain questions of Burrows. There is nothing in the philosphy of *Miranda,* et al., that would prohibit law enforcement officers from discussing matters initiated by the suspect. *State v. Daniels,* 41 Or App 243, 597 P2d 1277 (1979); *see State v. Atherton,* 242 Or 621, 628, 410 P2d 208, *cert den* 384 US 1025 (1966).

■ The interrogation was not resumed until defendant asked: "Where do I start?" Burrows simply gave accurate responses to defendant's questions and the statements made by him and Dickson were not provocative assertions calculated to spark an incriminating response from defendant. However, once the interrogation commenced, without the presence of

an attorney, the state is put to a heavy burden of showing under a totality of the circumstances that the defendant knowingly and intelligently waived his right to counsel before the statement is admissible in direct evidence. *Miranda v. Arizona, supra,* 384 US at 473-75; *Fare v. Michael C.,* 422 US 707, 99 S Ct 2560, 61 L Ed 2d 197, 212 (1979); *North Carolina v. Butler,* 441 US 369, 99 S Ct 1755, 60 L Ed 2d 286 (1979); *State v. Foster,* 288 Or 649, 655, 607 P2d 173 (1980); *State v. Singleton,* 288 Or 89, 104, 602 P2d 1059 (1979).

■ From the totality of the circumstances we conclude that defendant understood his right to counsel and that he knowingly and intelligently waived this right and proceeded to give his confession. The law enforcement officials "scrupulously honored" his request for his rights in that they ceased their interrogation of him and made no attempt to persuade, threaten, or subtly cajole him into speaking, *compare, Brewer v. Williams,* 430 US 387, 97 S Ct 1232, 51 L Ed 2d 424 (1977); *State v. Foster, supra; State v. McDade,* 44 Or App 269, 605 P2d 752 (1980); *State v. McGrew,* 38 Or App 493, 590 P2d 755, *rev den* 286 Or 149, *cert den* 444 US 867 (1979); *State v. Rodriguez,* 37 Or App 355, 587 P2d 487 (1978), *rev den* 285 Or 319 (1979); *State v. Johnson,* 37 Or App 209, 586 P2d 811 (1978), *rev den* 285 Or 479 (1979); *State v. Turner,* 32 Or App 61, 573 P2d 326 (1978); *State v. Paz,* 31 Or App 851, 572 P2d 1036 (1977), *rev den* 282 Or 189 (1978); *State v. Dyke,* 19 Or App 705, 528 P2d 1073 (1974); *State v. Garrison,* 16 Or App 588, 519 P2d 1295, *rev den* (1974); *State v. Suggs,* 13 Or App 484, 511 P2d 405 (1973). The statement was admissible.

■ Defendant's second assignment of error raises the issue of whether a twenty-year minimum sentence was excessive under ORS 163.115(5) (1977). In *State v. Davis,* 44 Or App 549, 555, 606 P2d 671, *rev den* 289 Or 45 (1980), we held that under the former statute (ORS

163.115(5))[1] the court had no authority to impose greater than a ten-year minimum sentence. The judgment is affirmed, the sentence is vacated and the case is remanded for resentencing.

Remanded for resentencing.

---

[1] ORS 163.115(5) was amended by initiative effective December 7, 1978. That section now reads:

"Except when a sentence of death is imposed pursuant to ORS 163.116, a person convicted of murder shall be punished by imprisonment for life and shall be required to serve not less than 25 years before becoming eligible for parole."