Argued January 22, reversed and remanded March 11,
reconsideration denied April 16, petition for
review denied June 18, 1974

# STATE OF OREGON, *Respondent, v.* MARK ANDREW GARRISON (No. 14-678), *Appellant.*

### 519 P2d 1295

*Gary D. Babcock,* Public Defender, Salem, argued the cause and filed the brief for appellant.

*Thomas H. Denney,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before SCHWAB, Chief Judge, and LANGTRY and FOLEY, Judges.

FOLEY, J.

Defendant was convicted by a jury for the crime of murder in violation of ORS 163.115 on an indictment charging that he strangled Daniel Burns Boles with a rope. He raises two assignments of error: (1) that certain incriminating statements were made and used against him after he had requested the as-

sistance of counsel, and (2) that out-of-court admissions of his accomplice should not have been admitted at trial.

Defendant in his testimony at trial admitted that he and the accomplice, Daniel Deaver, conspired to make a trip to downtown Portland for the purpose of stealing an automobile. On September 3, 1972, at 7:30 p.m., they made such a trip and at approximately 3 a.m. on the morning of September 4, 1972, they stopped a car driven by Boles. Garrison was armed with a sheath knife while Deaver was armed with a straight razor. After talking with Boles for a time, Deaver placed the razor to Boles' throat and both the defendant and Deaver got into Boles' car. After driving for a distance in an easterly direction, they stopped the car and both men tied up Boles, blindfolded him, and placed him in the back seat of the automobile. They then proceeded in the direction of a cabin owned by Garrison's parents in a rural area of Washington County. Upon their arrival in the area, Garrison, who was driving, stopped the car; he contends that he got out of the car to urinate while Deaver removed Boles from the automobile. Garrison returned to the car, cleaned up some dirt that had gotten on the seat, and after Deaver returned without Boles, drove back to Portland. Deaver had obtained Boles' wallet, watch, money, belt and a ring.

The afternoon of September 4, 1972, Garrison and Deaver left Portland in the car they had stolen from Boles and proceeded down the freeway toward Salem. During the course of this trip they were stopped by a state policeman after a high-speed chase. Garrison, who was driving the car, presented Boles' wallet and claimed that Boles had loaned him the auto-

mobile. The policeman gave Garrison the proper *Miranda*[1] warnings at the scene. Deaver was released, but Garrison was detained by the officer and was transported to the Marion County jail; the car was impounded.

On September 4, 1972, at 8:35 p.m., defendant was again questioned for a short time by the police about the automobile and the circumstances under which he had obtained it. Again, *Miranda* warnings were given.

Deaver returned to Portland and, around six or seven that evening, he gave Boles' watch and belt to a neighbor in his apartment building to conceal. There was testimony that during this transaction he told the neighbor that he and Garrison had taken Boles out in the country and had strangled him. He repeated this statement to another neighbor later in the evening while they were going downtown with the stolen watch in an effort to sell it to raise bail money for Garrison.

At 5 a.m on September 5, 1972, two officers from the Multnomah County Sheriff's Department came to the Marion County jail to further question Garrison. They first gave him an abbreviated *Miranda* warning:

> OFFICER: "Mark, you have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to an attorney; the right to have one present when we're talking with you. If you give up these rights, a—, we'd like to talk with you at this time. Do you understand these rights?"
>
> GARRISON: "Yes, I do."

[1] Miranda v. Arizona, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974 (1966).

OFFICER: "With these in mind, do you want to talk to us?"

GARRISON: "All right."

Defendant repeated his original statement that he had met Boles in Portland and that Boles had loaned him the car for the day. The officers then confronted Garrison with Boles' ring which had been found upon his (Garrison's) person. Garrison contended that Boles must have given it to him. The following pertinent colloquy then transpired:

OFFICER: "* * * Now, you say he's never given you anything?"

GARRISON: "Well—"

OFFICER: "This [the ring] is going to put you in jail. Now, you got a, you got a chance right now to come clean, to cough up and tell us where we're going to find him. That's done it to you, whether it takes us a year to find him, two years, or whenever, that ring did it to you."

GARRISON: "Why, I have no idea where he's at."

OFFICER: "How'd you get that ring from him?"

GARRISON: "How? That ring—he must have given it to me 'cuz I never received—"

OFFICER: "Oh, now look, Mark, okay, don't start this. You just got through—I went through it four or five times with you. You've never received any property from him other than the car keys, the car, his billfold with—"

GARRISON: "That is the first time I'd been asked if I'd ever received any other property prior or on yesterday's date—when, when you gentlemen just asked me."

OFFICER: "Hey, why don't we just quit beating around the bush? You've had it; you're caught; the game's up; it's over. It's—just the only thing from here on out, make it easy on yourself. Go the

easy way; go the right way, because we're going to put you on the polygraph; we're going to find out everything you told us, right and wrong, and we know more than we're even telling you. But don't take the hook all by yourself. If Dan was in on it, 'cuz we haven't talked with Dan, I'll level with you on that. We've talked to Diane; we've talked to Scott; we've talked to a lot of people. Why do you think it took us until four o'clock or five o'clock in the morning to get to you? Because we came down here armed with some information and know what we're doing and what we're talking about. Now, look at it this way. The jig's up; make it easy on us; make it easier on the boy's family because that boy's family are the ones that are really suffering. Make it easier on some other people and make your own conscience clear and easy, because it's done. It's over. Am I right?"

GARRISON: "About what?"

OFFICER: "About it being over and making it easier on yourself."

GARRISON: *"I'd like the presence of a public lawyer then, because I'm going to get some things straight here."*

OFFICER: "Okay. Is there anything you want to straighten with us first?"

GARRISON: "No, there isn't."

OFFICER: "We'll get you a lawyer. There's no problem there, Mark, but we want to know where the boy's at because we don't know—"

GARRISON: "Where Dan's at?"

OFFICER: "Yeah."

GARRISON: "I have no idea where Dan is at."

OFFICER: "We think you do."

GARRISON: "I don't."

OFFICER: "Like I say, it's going to come falling harder because as soon as—all we got to do is find that boy and, like I say, that puts the noose around your neck. We won't need a confession. We

won't need nothing! Nothing! You've had it! But we want—we've got a lot of manpower working here on this case and we've got some pretty upset folks. We got some people that are ninety years old who could even die over this case because it's a, it's a nephew, a close nephew, a very close nephew. * * *" (Emphasis supplied.)

The officers continued to question the defendant about the car and ring without obtaining incriminating admissions until about 5:25 a.m. when the defendant again requested the presence of an attorney. The officers then terminated the interrogation. Twelve minutes later, however, the tape was resumed, *Miranda* warnings were given and Garrison indicated that he wanted to make a statement. He then implicated himself in the robbery and transportation of Boles but denied any involvement in the actual killing, although he did acknowledge that he knew that Boles had been strangled.

While testimony differs as to what occurred during the twelve minute gap, it appears from the record that the officers, at least to a limited extent, continued their questioning of Garrison. It was only when Garrison was led to believe that Deaver had disappeared that he started to talk.

At the conclusion of Garrison's statement at 5:55 a.m., he was asked by the officers about his earlier request for an attorney:

OFFICER: "Okay. Okay. For the record, Mark,"

GARRISON: "Mm-hm."

OFFICER: "You will be prosecuted for your part in this incident."

GARRISON: "Yes, I know."

OFFICER: "Will you be willing to testify as to Dan Deaver's part in the crime?"

GARRISON: "Yes, I will, as state's material witness."

OFFICER: "Yeah. Now, just for one other thing I want to mention here. Earlier in this transcribed, transcription here of this tape recording, you indicated that you did want to see an attorney —"

GARRISON: "Mm-hm."

OFFICER: "—and then you did change your mind. Now a—"

GARRISON: "I would still like to see an attorney."

OFFICER: "We told you you could see an attorney but, what I'm getting at, you did proceed with your testimony to us and it was not because you were coerced or promised—"

GARRISON: "No."

OFFICER: "—anything."

GARRISON: "It was in a voluntary manner."

OFFICER: "Right. You did decide you wanted to get this off your shoulder and straighten things out."

GARRISON: "Well, I was advised by you two officers that it would be the best thing."

OFFICER: "Right, but you've been made no promises, no threats."

GARRISON: "No, none at all."

OFFICER: "No rubber hoses beating on you—"

GARRISON: "No."

At the conclusion of this interview, defendant was first taken to Multnomah County and then, in the company of the officers who had interrogated him in Marion County as well as other police officials, he directed them to the scene where the body of Boles was ultimately found. A video tape and audio recording were made of Garrison pointing out the location of

the body; *Miranda* warnings were given at the time. This trip to the scene was made around 9 a.m., September 5, 1972.

Finally, at 12 noon, defendant was questioned by two officers from Washington County and, again, he repeated essentially the same statement made earlier. He was given a proper *Miranda* warning before the questioning commenced. The two officers were apparently unaware of his earlier requests for an attorney.

The trial court, at the suppression hearing on March 20, 1973, after listening to the taped interrogation in Marion County, said:

"The Court is concerned when a defendant in any case asks for an attorney and then the officer waives that aside and says, Yes, you will have an attorney, but we want to find out about this, and this, and this, including a ring, which would, if allowed, would undoubtedly be incriminating to the point of probably convicting him, I don't know, but a series of questions was asked at that time that concerns the Court.

"* * * * *

"* * * I am not responsible for requiring a Miranda hearing in the first place but * * * I am responsible to see that the Miranda protection is properly given to a defendant whether he is charged with murder or what * * *."

The court then adjourned the hearing for briefs and study by the court.

It is not clear what dispelled the trial court's concern about the admissibility of the taped interrogation, but two months later, on May 21, 1973, the court announced that it had had an opportunity to study

the transcript and further go into the law on the subject, and ruled without explanation:

"* * * [Defendant] was informed of his rights under the Miranda Rule, he understood them, he effectively waived them and made a statement. The Court finds so beyond a reasonable doubt * * *."

Proper objection was made to the admission of the taped interrogation conducted in Marion County. Except for the preliminary portion thereof, we disagree with the trial court and, as hereinafter pointed out, find that the admission of the taped interrogation was in violation of defendant's *Miranda* rights and improper. The court also admitted portions of the video and audio tapes made at the scene and the taped interview in Washington County; defense counsel made proper objections as to their admissibility. We find that this admission also was improper.

## A. MARION COUNTY TAPE

■ While the *Miranda* warning given at the beginning of the interrogation was incomplete in that it did not inform the defendant that a lawyer would be provided for him if he were without funds, *Miranda v. Arizona,* supra, 384 US at 473, he had been given two complete warnings within a relatively short time of the interrogation. Repeated warnings, while desirable, were not absolutely necessary. *Kennedy v. State,* — Ark —, 499 SW2d 842 (1973); *State v. Vidal,* 82 Wash2d 74, 508 P2d 158 (1973).

■ The rule required to be followed by this court concerning a defendant's request for an attorney as mandated in *Miranda v. Arizona,* supra, was quoted in *State v. Suggs,* 13 Or App 484, 489, 511 P2d 405 (1973):

"The law is clear as to the procedure to be fol-

lowed if an in-custody defendant requests an attorney:

"'Once warnings have been given, subsequent procedure is clear. * * * If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. * * *' *Miranda v. Arizona*, 384 US 436, 473-74, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974 (1966)."

Here the defendant's first request was:

"I'd like the presence of a public lawyer then, because I'm going to get some things straight here."

The state contends that this request was equivocal so that further interrogation was possible. We do not agree. In *Frazier v. Cupp*, 394 US 731, 89 S Ct 1420, 22 L Ed 2d 684 (1969), the Court indicated that a more equivocal but similarly worded request[2] would bring the *Miranda* prohibition into play. Moreover, we have listened to the tape recording of the Marion County interview and, taken in context, the request for a lawyer was not at all equivocal. We are compelled to conclude that all statements made thereafter must be suppressed.

■ The state argues that even if the questioning should have stopped at this point, the defendant's decision to make a statement after the second request for an attorney and after the recorder had been turned off was entirely on his own. We again refer to *Miranda v. Arizona* which holds that once a request for an attorney is made it is the duty of the officer to immediately discontinue the questioning. The evidence demonstrates that even after the officers turned off

[2] " 'I think I had better get a lawyer before I talk any more. I am going to get into trouble more than I am in now.' " *Frazier v. Cupp*, 394 US at 738.

the recorder they continued to question the defendant about the ring and the location of the body and advised the defendant it would be best to tell the whole story. Particularly in light of their earlier statements about the ring and its part in his future prosecution, this discussion with the defendant retained its accusatory character. The facts demonstrate that the interrogators did not, in fact, discontinue the questioning; consequently, we reject the state's argument. It is thus necessary to exclude the statements made by the defendant after his first request for an attorney.

At the time the *Miranda* violation occurred not only was the victim's whereabouts unknown by the police, it was also unknown by them whether the victim was dead or alive. The pressure on the police and the importance of finding the victim renders understandable their overzealousness and their desire to continue questioning the defendant even though further questioning was in violation of the *Miranda* exclusionary rule. This they must have known was at the sacrifice of having any evidence thus developed excluded from use in future court prosecution. Nevertheless, the *Miranda* rule which we are required to enforce does not allow exception because of the urgency of criminal detection or the supposed heinousness of the offense. At this time, seven years after *Miranda* was decided, its rules and requirements should be known to every policeman, prosecuting attorney and trial judge.

### B. THE VIDEO AND AUDIO TAPES AT THE SCENE

At the conclusion of the interrogation in Marion County the defendant again requested an attorney. Like his two previous requests, this request was also

ignored by the officers. Under *Miranda v. Arizona,* supra, we are compelled to exclude all the statements and activities represented in the video and audio tapes since they also directly followed his denied request for an attorney.

## C. THE WASHINGTON COUNTY TAPES

The trial court ruled that the tapes of the interview in Washington County were properly admitted in that the defendant had been given his *Miranda* warnings and had freely made his statement. In addition, the court found that neither officer conducting the questioning had any knowledge of the previous request for an attorney. We do not find the lack of knowledge or the giving of a proper warning to be determinative.

In *Westover v. United States,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966), a companion case to *Miranda,* the Court addressed the problem of a subsequent interrogation following an improper interrogation:

> "We do not suggest that law enforcement authorities are precluded from questioning any individual who has been held for a period of time by other authorities and interrogated by them without appropriate warnings. A different case would be presented if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them. * * *" 384 US at 496.

In the case at bar, although the defendant was removed in place from his original interrogation, the time interval was not sufficient to dissipate the taint. With regard to this original interrogation, Garrison had been

in continuous police custody and observation since 5 a.m. and had been questioned extensively. The statements made to the Washington County officers were only six hours after his original incriminating remarks. Under the totality of the circumstances, the mere giving of the warnings by the officers in Washington County was not enough to dissipate the taint.

■ There is an additional reason why these statements (as well as the video and audio tapes) must be excluded. Once Garrison made his original statement, the "cat was out of the bag." He was never thereafter free of the psychological and practical disadvantage of having made the admissions; he could never get the "cat back in the bag." *United States v. Bayer,* 331 US 532, 540, 67 S Ct 1394, 91 L Ed 1654 (1947). The later warning and lack of knowledge of the Washington County officers were not sufficient to dissipate the effect of the tainted admissions. *See Gilpin v. United States,* 415 F2d 638, 642 (5th Cir 1969); *State v. Keller,* 240 Or 442, 402 P2d 521 (1965).

■ For the foregoing reasons we find that all statements made by the defendant after his first request in Marion County for an attorney were improperly admitted at trial. Since we cannot say that their erroneous admission was "very unlikely to have changed the result of the trial," *State v. Van Hooser,* 266 Or 19, 511 P2d 359 (1973), the judgment must be reversed. *Cf. State v. Ayers,* 16 Or App 300, 518 P2d 190, Sup Ct *review denied* (1974).

■ Because the issues raised in defendant's second assignment of error will doubtless arise on a retrial of this case, we will discuss them here. His second assignment of error relates to the admission of certain statements made by Deaver, defendant's accomplice,

to several neighbors while he was in the process of concealing or attempting to dispose of some of the stolen property. There is evidence that defendant and Deaver conspired to commit a robbery and to take the victim of the robbery into the country and "dump" him and that defendant was armed with a knife during the commission of this robbery. It is defendant's contention, however, that there was no conspiracy to commit murder. Each conspirator is responsible for everything that follows as the natural and probable consequence of the execution of the common design even though not intended as a part of the original plan. *State v. Johnson,* 7 Or 210 (1879) ; 1 Wharton, Criminal Law and Procedure 194-96, § 90 (Anderson 1957).

Under ORS 41.900 (6), after proof of a conspiracy, the declaration of a conspirator against his coconspirator and relating to the conspiracy is admissible. The statements of Deaver incriminating defendant were made while he was in the process of concealing and, later, attempting to sell the fruits of the robbery. The conspiracy was continuing since the stolen property still had not been disposed of. *State v. Gardner,* 225 Or 376, 384-85, 358 P2d 557 (1961) ; *see also* 3 Wharton, Criminal Evidence 338-39, § 643 (Torcia 1973). Since the possibility of murder was a foreseeable result of the conspiracy to rob, and since the conspiracy was continuing, the statements of the coconspirator were properly admitted under ORS 41.-900 (6). *See State v. McGee,* 341 Mo 148, 106 SW2d 478 (1937). *See also Reed v. People,* 156 Colo 450, 402 P2d 68 (1965) ; 22A CJS 1185, Criminal Law § 780.

Reversed and remanded.