No. 52,293

STATE OF KANSAS, *Plaintiff-Appellee,* v. TIMOTHY L. NEWFIELD, *Defendant-Appellant.*

(623 P.2d 1349)

Opinion filed February 28, 1981.

*Roger Unruh,* of Junction City, argued the cause and was on the brief for the appellant.

*Stephen M. Joseph,* of Wichita, and *Douglas B. Westerhaus,* county attorney, argued the cause, and *Robert T. Stephan,* attorney general, *Christopher Y. Meek,* assistant attorney general, and *John C. Johnson,* former county attorney, were on the brief for the appellee.

The opinion of the court was delivered by

PRAGER, J.: This is a direct appeal in a criminal action in which

the defendant, Timothy L. Newfield, was convicted of murder in the second degree (K.S.A. 21-3402), aggravated kidnapping (K.S.A. 21-3420), aggravated robbery (K.S.A. 21-3427) and aggravated burglary (K.S.A. 21-3716). The victim of the homicide was Grant Avery, a banker of Peabody, Kansas. Prior to trial, the defendant filed a motion to suppress, as evidence, the defendant's confession and certain articles obtained during a search of the defendant's automobile and apartment. The trial court overruled the motion to suppress. Following his conviction, the defendant appealed to this court raising on the appeal a single issue—Did the district court err in overruling the defendant's motion to suppress?

Because the correctness of the ruling of the trial court depends upon the totality of the factual circumstances, the facts must be set forth in some detail. They are not greatly in dispute and essentially are as follows: On July 29, 1979, at about 10:30 p.m., Wilbur Avery of Peabody received a telephone call from his son, Grant Avery. Wilbur Avery was president of the Peabody State Bank, and Grant was the head teller. Grant informed his father that he was being held at gunpoint in his home by a man who demanded money from the bank. Grant had informed the man that the vault was on a time lock and could not be opened until 8:00 a.m. the following morning. Wilbur Avery immediately drove to his son's house, entered and had a conversation with an unseen intruder who was in another room. Wilbur Avery confirmed the fact that the bank vault would be locked until the following morning. Wilbur Avery was then told by the unseen intruder to leave, which he did. When Wilbur left the house, Grant was alive and his red Thunderbird was parked in front. Thereafter, a neighbor saw Grant leave in his red Thunderbird accompanied by an unidentified person.

Grant Avery's body was found in a field north of Peabody, about a half mile from a county road. He had been shot twice in the head. His red Thunderbird was found several days later, abandoned behind a warehouse in Wichita. The KBI began its investigation by questioning everyone known to have been seen out in Peabody on the evening of July 29, 1979. Defendant Newfield had been observed driving his older model Chevrolet Nova around Peabody that evening accompanied by a blonde. The defendant voluntarily approached the KBI agents on July 31,

1979, having received word that they wanted to talk to him. As he talked to the agents, he sat on the hood of his car with one foot protruding. Agent J. Vernon Humphrey noticed that defendant's shoe sole had a herringbone design similar to footprints found near the body. Defendant told Agent Humphrey that he had been in Peabody with Karen Parker on the evening of July 29th, driving his Nova station wagon around town until he left Peabody for his home at Haysville around 11:00 or 11:30 p.m. Defendant told the agent that he would return to Peabody, if they wanted to question him further. Further investigation by the KBI agents disclosed that a car, having the same description as defendant's Chevrolet Nova, was seen about 11:30 p.m. on July 29 driving north following a darker colored car on a county road. Both cars were seen taking a right turn onto the road where the body was eventually found. The defendant was seen by several people the following day, driving the red Thunderbird belonging to Grant Avery. At this point, the focus of the investigation centered on defendant Newfield.

On August 3, 1979, Agent Humphrey telephoned defendant at his Haysville apartment. The defendant was informed that the KBI was still investigating the Avery homicide and that the KBI agents wanted the defendant to come to the Haysville Police Department to answer more questions. The telephone call was made at 2:15 p.m., and Newfield voluntarily appeared for further questioning at 2:20 p.m. The interview was conducted in an office of the police department by KBI agents, J. Vernon Humphrey and Thomas B. Lyons. Defendant was told that the agents wanted to ask him more questions about the homicide, and, because it was not known how he was going to respond, he would first be advised of his rights under *Miranda.* Agent Humphrey then proceeded to read the standard *Miranda* warnings from a card. The defendant agrees that the *Miranda* warnings were read to him. Defendant indicated that he understood his rights and that he wished to talk to the agents at that time. He indicated that he had an eleventh grade education and that he understood and could read and write the English language. At the time of the homicide, defendant was 18 years of age and, thus, an adult.

Newfield was asked if the agents could take his fingerprints. He refused, stating that he had been in Grant Avery's car and that his fingerprints would be found there. Defendant was then asked

about the red car that he had been seen driving. He first denied that he had been driving the car, then stated the car had been brought to his apartment by a friend who told him he could drive it around. Finally, he stated that he knew the car belonged to Grant Avery and that he had abandoned the car in Wichita. Defendant further stated that Chad Dameron, his roommate, was with him at the time the car was abandoned. The defendant then asked the KBI agents a series of hypothetical questions. Defendant inquired as to how much time he could receive in prison if he was responsible and inquired specifically about prison conditions and sexual assaults within the prison. Humphrey advised him as to the penalty for kidnapping and murder and told defendant that people placed in prison went through an orientation which instructed them how to cope with prison conditions. The defendant then asked, "Hypothetically, what would happen if, when we're out in the country, Grant grabbed the gun, it went off . . . ." Newfield was advised that the accidental nature of the killing would have to be proved. At this point, it is undisputed that the statements were made by defendant voluntarily and with knowledge of his *Miranda* rights.

Defendant Newfield then stated that he wanted to talk to a lawyer before he talked to the agents any more. Humphrey indicated the telephone on the desk and told defendant that he could call any lawyer he liked. Defendant said he did not know any attorney except his father's attorney and that he could not afford an attorney anyway. Humphrey told defendant that an attorney would be appointed for him. Defendant responded that he did not want an appointed attorney because they weren't any good. Humphrey then told defendant that Marion County had the public defender system, and that the public defenders were probably as good as anyone he could hire, because all they did was defense work. Defendant said he had better talk to a public defender. The defendant's request for an attorney occurred at 3:13 p.m. Following his request, Agent Humphrey responded that the defendant would have to tell his attorney the truth before his attorney could help him, and that if Newfield wanted to talk to the KBI agents about Grant Avery's death, it would have to be now because his attorney would tell him not to talk to the KBI. Agent Lyons then told defendant to think it over, that the people of Peabody would probably think more of Newfield if he told the

truth about Grant Avery's death than if he didn't. At approximately 3:15 p.m., Agent Humphrey advised Newfield that he was under arrest for the kidnapping and murder of Grant Avery. Humphrey then told Newfield that he was now entitled to take Newfield's fingerprints and proceeded to obtain his kit so that he could do so.

At 3:18 p.m. Newfield advised Humphrey and Lyons, "Get your pencil. I'm going to tell you all about it." Agent Lyons proceeded to get Newfield a soft drink. Then, without further questioning by either of the agents, for approximately ten minutes, defendant narrated a statement making himself responsible for the death of Grant Avery. Defendant told the agents that he was low on money, that he got out of his car on the street north of Grant Avery's house, went down the alley to Grant's house and knocked on the door. Grant Avery answered the door. Defendant demanded money. Grant said that he did not have any and told defendant the bank vault was on a time lock and it wouldn't open until 8:00 a.m. the following morning. Grant Avery then telephoned his father. He came to Grant's house and told defendant the time lock would not open until 8:00 a.m. the next morning. Defendant told Grant's father to leave. Then defendant told Grant that he was going to drive him out in the country. He had told Karen to follow him. They drove out there and Grant got out of the car. Defendant saw the headlights of his car, driven by Karen. Defendant described the shooting as an accident, stating, "I'm a hunter, and I had my finger on the trigger and that's why it went off. I thought the safety was on, and after the gun went off, I said, Oh, my God." Defendant could see Grant was bleeding and that he was not dead. That is where the second shot came in. Defendant fired a second shot so that Grant Avery would not survive as a "vegetable." Karen came up and defendant told her to drive back to Haysville. Defendant dragged Grant's body over to the side of the road and then defendant drove Grant's car back to Haysville. That was the substance of defendant's narration.

Following this statement, Agent Humphrey questioned defendant as to the time he arrived home and the route he took from the point of the homicide back to Haysville. Defendant was asked about a missing gas cap from Grant Avery's car. Defendant thought the gas cap was in his car. Humphrey asked defendant about the gun and the defendant said it was in his apartment.

Humphrey asked the defendant about the license plates that were on Avery's car; defendant said that he had peeled them off and thrown them out while driving down the road. Defendant said he thought the jack that formerly was in Grant Avery's car was in the defendant's car. Humphrey asked the defendant about Grant Avery's check book, wallet, and credit cards. At Humphrey's request, defendant signed two consent forms to search his car and his apartment. Newfield drew diagrams of Grant Avery's house and the crime scene where Grant Avery's body was found. Newfield's fingerprints were then taken.

Shortly after 4:00 p.m. on August 3, 1979, KBI agents and sheriff's deputies searched defendant's car, finding the jack handle, stand, and base taken from Grant Avery's car. On the same day, a search was conducted at defendant's apartment in Haysville. During the search of defendant's apartment, officers seized a locking gas cap and keys, a wallet which contained the credit cards and driver's license of Grant Avery, shotgun shells, a hacksaw, and two shotguns. During the course of the search of defendant's apartment, Agent Humphrey requested other agents to bring Chad Dameron, defendant's roommate, to the apartment. After Agent William Delaney brought Dameron to the apartment, Agent Delaney heard Dameron ask Newfield if he was responsible for Avery's death. Newfield replied, "You don't know the truth of what happened? He grabbed at it and jerked at it and it went off." On August 6, 1979, a search warrant was issued and Newfield's apartment was once again searched. During this search, one of the agents found a social security card bearing the name of Grant Avery.

Prior to trial, defendant filed a motion to suppress defendant's statement and all the evidence obtained in the searches. An evidentiary hearing was held on the defendant's motion on August 17, 1979. The district court denied the motion to suppress. The trial court in determining the motion made specific findings of fact and conclusions of law. It found that the defendant was advised of his rights and understood his rights at the time he made the statement on August 3, that the confession was voluntary, and that the statements made by the agents after defendant's request for counsel were not coercive and did not amount to questioning in violation of *Miranda.* The court also refused to suppress the physical evidence obtained in the searches of the

defendant's automobile and apartment, holding the consents to search were signed voluntarily and independently of the defendant's statement.

The defendant was tried before a jury during the week of January 21, 1980, and was convicted on January 24, 1980. During the trial, the district court conducted a *Jackson v. Denno* hearing outside the presence of the jury before admitting Agent Humphrey's testimony concerning defendant's inculpatory statement. The trial court again heard the evidence as to the factual circumstances surrounding the taking of defendant's statement and held it to be voluntary and admissible. Following his conviction and sentence, the defendant appealed.

The sole issue presented on the appeal is whether the trial court erred in overruling the defendant's motion to suppress. The question presented is not an easy one. In order for us to determine this issue, it is necessary that we carefully review the relevant decisions of the United States Supreme Court and of this court. In *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602 (1966), the Supreme Court discussed the necessity of apprising one criminally accused of his constitutional rights against self-incrimination and to the assistance of counsel before conducting an in-custody interrogation. The court stated:

"The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." pp. 444-45.

A number of cases, adhering to a literal interpretation of this language, hold that any incriminating statements made by an accused in response to police questioning after the accused has requested counsel are involuntary under *Miranda*. See *People v. Superior Court (Zolnay)*, 15 Cal. 3d 729, 735-36, 125 Cal. Rptr. 798, 542 P.2d 1390 (1975), *cert. denied* 429 U.S. 816 (1976); *State v. Garrison*, 16 Or. App. 588, 599, 519 P.2d 1295, Sup. Ct. *rev. denied* (1974).

The *Miranda* court did not require the cessation of questioning to be absolute, however, and stated that incriminating statements

made after a request for counsel could be rendered voluntary if preceded by a knowing and intelligent waiver. In so holding, the Supreme Court stated:

"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Escobedo v. Illinois, 378 U.S. 478, 490, n. 14. . . .

"[A] valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained. . . .

. . . .

"[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." pp. 475-76.

Subsequent Supreme Court cases have followed the rule that *Miranda* safeguards may be waived and later confessions may be voluntary because of a valid waiver. *North Carolina v. Butler,* 441 U.S. 369, 60 L.Ed.2d 286, 99 S.Ct. 1755 (1979); *Brewer v. Williams,* 430 U.S. 387, 404, 51 L.Ed.2d 424, 97 S.Ct. 1232 (1977).

In *Michigan v. Mosley,* 423 U.S. 96, 46 L.Ed.2d 313, 96 S.Ct. 321 (1975), the Supreme Court interpreted *Miranda* to require some cessation of the interrogation once the accused has invoked a *Miranda* right, requiring the interrogator to "scrupulously honor" those rights once asserted. The *Mosley* court explained:

"To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned. At the other extreme, a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles . . . .

"A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt 'fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored . . . .' [Citation omitted.] The critical safeguard identified in the passage at issue is a person's 'right to cut off questioning.' " pp. 102-03.

In the most recent Supreme Court decision interpreting *Miranda,* the Supreme Court discussed neither the necessity of a valid waiver nor the necessity of a cessation of interrogation, deciding the case only on the definition of "interrogation" forbidden after the accused has asserted his right to remain silent. In

*Rhode Island v. Innis,* 446 U.S. 291, 64 L.Ed.2d 297, 100 S.Ct. 1682 (1980), the Supreme Court held the *Miranda* safeguards to be applicable whenever a person in custody is subject to either express questioning or its "functional equivalent" in the form of "any words or actions on the part of the police   .   .   .   that the police should have known are reasonably likely to elicit an incriminating response from the suspect." p. 301. In *Innis,* the defendant had been arrested for murder and armed robbery. After being read the *Miranda* warnings, defendant indicated that he wished to talk to an attorney before talking with the police. En route to the police station, two of the officers carried on a discussion among themselves, which could be overheard by the defendant but was not directed toward him. The substance of the conversation was that there was a school for handicapped children nearby, expressing concern that one of the children might find the murder weapon and be harmed. Hearing this, defendant told the officers to turn around, and directed them to the location of the weapon. The admission of the incriminating statement was upheld, because the officers "could not have known" that defendant would have been susceptible to such comments.

These three decisions must be viewed cumulatively. Thus, this court must decide whether the State has adequately proved (1) that the accused knowingly and intelligently waived his right to retained or appointed counsel; (2) that interrogation ceased for an appreciable period when the accused requested consultation with an attorney; and (3) that the statements made by the police after the request for counsel did not amount to questioning, its functional equivalent, or statements known to be likely to produce an incriminating response. See, *e.g., In Interest of Durand,* 206 Neb. 415, 293 N.W.2d 383 (1980); *State v. McNitt,* 207 Neb. 296, 298 N.W.2d 465 (1980); *State v. Munro,* 295 N.W.2d 437 (Iowa 1980).

On numerous occasions the Kansas appellate courts have found valid waivers of constitutional rights protected under *Miranda.* In *State v. Costa,* 228 Kan. 308, 613 P.2d 1359 (1980), for example, this court found a valid waiver where the defendant did not contend the incriminating statements were involuntary, but only that they were made without the presence of counsel. This court stated:

"An accused may effectively waive the right to have counsel present during any police interrogation. The fact that he has previously retained counsel does not

necessarily make inadmissible a voluntary statement made by the defendant in his counsel's absence." p. 314.

See also *State v. Creekmore,* 208 Kan. 933, 934, 495 P.2d 96 (1972); *State v. Cantrell,* 201 Kan. 182, 188, 440 P.2d 580, *cert. denied* 393 U.S. 944 (1968).

In *State v. Kanive,* 221 Kan. 34, 558 P.2d 1075 (1976), the accused was given the *Miranda* warnings and questioned about the rape of his grandmother. Defendant indicated that he did not want to talk with the interrogating officer. He was later questioned by another officer about his participation in a robbery and murder, and confessed to that crime. In reference to *Miranda,* this court stated:

"The prohibition against continued interrogation in the face of a refusal to talk does not invalidate a statement thereafter given where the right to remain silent has been voluntarily and knowingly waived at a later time. [Citation omitted]." p. 37.

In *State v. Law,* 214 Kan. 643, 522 P.2d 320 (1974), defendant was arrested, and refused to talk with police without an attorney. He was questioned the following morning by another officer who was aware of his prior request for counsel. The *Law* court held:

"We recognize, of course, the teaching of Miranda that law enforcement officers are not to be permitted to attempt in-custody interrogation and if met by a refusal, to return the defendant to jail and then repeat the procedure periodically until a statement is obtained. However, we do not stretch this prohibition to invalidate a statement given after an otherwise valid voluntary waiver of both the right to counsel and the right to remain silent is knowingly and intelligently made." p. 648.

The Court of Appeals has also found valid waivers of the accused's *Miranda* rights after requesting an attorney. *State v. Holt,* 2 Kan. App. 2d 1, 573 P.2d 1117 (1978); *State v. McConico,* 4 Kan. App. 2d 420, 607 P.2d 93 (1980). This court has also upheld *inferred* waivers in *State v. Jackson,* 226 Kan. 302, 305, 597 P.2d 225, *cert. denied* 445 U.S. 952 (1979), holding that "a suspect in custody need not explicitly waive his right to counsel. Waiver can be inferred from the surrounding circumstances." See *North Carolina v. Butler,* 441 U.S. 369.

The general rules relating to the voluntariness of confessions and *Miranda* waivers are as follows: Uncoerced statements made to police officers by a defendant who has been given warning as to his constitutional rights are admissible as evidence at his trial.

*State v. Higdon,* 224 Kan. 720, 722, 585 P.2d 1048 (1978). In determining the voluntariness of a confession, it is to be viewed in light of the totality of circumstances, including the following factors: (1) The duration and manner of interrogation; (2) the accused's ability upon request to communicate with the outside world; (3) the accused's age, intellect and background; and (4) the fairness of the officers in conducting the interrogation. Essential to the inquiry is the determination that the statement was the product of the free and independent will of the accused. If the accused was not deprived of his free choice to admit, deny or refuse to answer, the statement may be considered voluntary. *State v. Prince,* 227 Kan. 137, 144, 605 P.2d 563 (1980); *State v. Watkins,* 219 Kan. 81, 97, 547 P.2d 810 (1976); *State v. Creekmore,* 208 Kan. at 934. The burden of proving the statement was voluntary rests with the State. *State v. Kanive,* 221 Kan. at 35. When the trial court conducts a preliminary inquiry, determines the confession to be voluntarily and intelligently given, and admits the statement into evidence at trial, the findings of the trial court are to be upheld on appellate review if supported by substantial, competent evidence. *State v. Levier,* 226 Kan. 461, 462, 601 P.2d 1116 (1979).

In the present case, defendant was read the *Miranda* warnings before the questioning began. He stated at that time that he understood the content of the warnings. His understanding is illustrated by his subsequent request for counsel before answering further questions. Immediately after the request, the accused and his interrogators discussed types of appointed counsel, with the KBI agents readvising him of his right to retained or appointed counsel. Defendant was offered access to a telephone to contact counsel, which he made no attempt to do. The agents advised defendant of the professional capability of the public defenders. After the discussion regarding his right to appointed counsel, defendant told the agents to get their pencils, that he would tell them about the homicide. Furthermore, defendant's subsequent conduct indicated a willingness to assist the KBI agents. Defendant assisted in the subsequent search of his apartment and automobile, and while the KBI agents were searching his apartment and within an agent's hearing range, he freely discussed the accidental nature of the shooting with his roommate. It should also be noted that in the present case defendant

does not argue that the statement was involuntary, only that it was made without the presence of and before consultation with counsel, as requested. Under the totality of circumstances, there is substantial, competent evidence to support the trial court's finding that the confession and waiver were voluntarily, knowingly, and intelligently made.

Kansas cases have alluded to the *Miranda* and *Mosley* requirements of an appreciable cessation of interrogation once the accused has asserted a *Miranda* right. *State v. Kanive,* 221 Kan. 34; *State v. Boone,* 220 Kan. 758, 768, 556 P.2d 864 (1976); *State v. Law,* 214 Kan. 643; *State v. Holt,* 2 Kan. App. 2d 1; *State v. McConico,* 4 Kan. App. 2d 420. There is no specified length of time necessary to meet the cessation requirements. In the present case there was only a five-minute time lapse between the request for counsel and the narration of the inculpatory statement. Other factors, however, support the termination as being sufficiently substantial under *Mosley.* Here, the interceding discussion regarding the appointment of counsel, the readvisement of defendant's right to appointed counsel, the opportunity to contact an attorney by phone, and the announcement that defendant was under arrest and would be fingerprinted sufficiently alerted the defendant that his right to remain silent would be "scrupulously honored." We think it important to emphasize that the KBI agents, by their words and actions, clearly indicated to defendant their intention to cease further questioning when Agent Humphrey announced that defendant was under arrest and that they were now entitled to take his fingerprints. Humphrey then proceeded to obtain his fingerprint kit. The evidence supports a finding that defendant, at that point, knew his right to remain silent would be honored and that his subsequent narration was simply a recognition by defendant that his possession of Grant Avery's car was established and that the whole story would be revealed when the KBI agents questioned Karen Parker and Chad Dameron.

The trial court did not have the benefit of the *Innis* opinion in deciding whether the comments made by the interrogating agents after the request for counsel constituted continued questioning prohibited under *Miranda.* The court did specifically find, however, that the statements were not coercive and that the statements did not amount to "questioning" in violation of *Miranda.*

Agent Lyons's statement that the people of Peabody would think more of defendant if he told the truth would fall within the rule that a "mere exhortation or adjuration to speak the truth, or the mere suggestion to an accused that he confess, will not exclude a confession." 29 Am. Jur. 2d, Evidence § 548, pp. 603-04; 3 Wharton's Criminal Evidence § 674, (13th ed. 1973). In *State v. Kornstett*, 62 Kan. 221, 227, 61 Pac. 805 (1900), this court stated:

"It is well settled that an extrajudicial confession will not be received in evidence unless it has been freely and voluntarily made. If it has been extorted by fear or induced by hope of profit, benefit, or amelioration, it will be excluded as involuntary. However, mere advice or admonition to the defendant to speak the truth, which does not import either a threat or benefit, will not make a following confession incompetent."

Accord, *State v. Demain*, 127 Kan. 716, 720, 275 Pac. 139 (1929).

Agent Humphrey's statement, that if defendant wanted to talk with the agents, it had to be now because an attorney would tell him not to talk with them, does not fall as neatly within *Kornstett* and *Innis.* While there are no Kansas cases in point, other jurisdictions have considered the effect of similar statements in light of the accused's right to remain silent. In *Thompson v. Wainwright,* 601 F.2d 768 (5th Cir. 1979), for example, the court held a similar statement violated the accused's *Miranda* rights when made after the accused requested the presence of counsel. In *Thompson,* the accused requested an attorney, and was told that if he talked with an attorney, he would be unable to tell his side of the story, because the attorney would tell him not to talk to them. It was held that the statement was presumptive, persuasive, and untrue, and that an interrogating policeman cannot, as could an attorney, advise the accused with the accused's best interests in mind.

In the present case, the statement that an attorney would advise him not to talk with the KBI may have been made with the intent to obtain a confession from defendant, but logic would dictate an opposite result. The statement, on its face, is not so coercive as to render the waiver and confession involuntary. There is substantial, competent evidence to support the trial court's finding that the statement was not so coercive that the defendant's will was overcome. Based on the content and surrounding circumstances, there is also competent evidence to hold the statement was not likely to elicit an incriminating statement if defendant didn't

want to make one and was not the "functional equivalent" of direct questioning after the assertion of the right to the presence of counsel, in violation of *Miranda* and *Innis.*

Defendant's other issues on appeal challenge the admission of physical evidence seized in the apartment and automobile searches. The basis for challenging those searches is the involuntary confession, which was claimed to have tainted the subsequent searches. Finding the confession to be voluntary and admissible, the court need not deal with those issues at length. Suffice it to say, the KBI agents had obtained more than sufficient information, prior to obtaining defendant's statement, to furnish probable cause for obtaining search warrants to search defendant's automobile and apartment.

We have also concluded that the admission of the defendant's confession into evidence, even if erroneous, was harmless error beyond a reasonable doubt in view of the overwhelming evidence presented by the State in its case against the defendant. We have carefully reviewed the record and note the following evidence introduced by the State which was independent of the confession claimed to have been illegally obtained. The defendant's Chevrolet Nova station wagon was observed around 11:30 p.m. on the evening of the homicide, driving north on a country road following a dark-colored car. The defendant was seen by several people the day after the homicide driving the red Thunderbird identified as that belonging to Grant Avery. Chad Dameron, the defendant's roommate, testified that he helped to dispose of the car the following day, by following defendant to the place where the car was abandoned in Wichita. Dameron testified that he saw Grant Avery's billfold, keys, and gas cap in their apartment, and that he put those articles into a tennis ball can. KBI agents had knowledge that Chad Dameron was the defendant's roommate prior to the time the statement was taken from defendant on August 3, 1979.

At the trial, the State called Karen Parker, who had been with defendant on the evening of July 29, 1979. She took the witness stand and told the whole story about the robbery and the shooting of Grant Avery which corroborated the narration given by defendant in his statement. It is clear from the record that prior to August 3, defendant had told the KBI agents that he had been driving around Peabody on the evening of the homicide in the

company of Karen Parker. She was thus a witness available to the State in the absence of the defendant's confession obtained on August 3, 1979.

In addition to the above testimony, the physical evidence established the defendant's presence in the car. Property belonging to Grant Avery was found in defendant's car and apartment. The shoeprints found at the scene matched the design on defendant's shoes. One of the weapons found in the defendant's apartment was tested and found to be the murder weapon. The defendant's fingerprints were found in the Thunderbird, on the wallet and identification cards, and on the murder weapon. The evidence presented by the State clearly established defendant's involvement in the homicide without the admission of defendant's statement. In addition to this evidence, the defendant himself took the stand and testified in accordance with his statement. The statement made on August 3, 1979, fully corroborated defendant's testimony at the trial and actually supported the defendant in his defense. The jury obviously believed the testimony of the defendant and of Karen Parker. The jury found defendant guilty of second-degree murder when it easily could have found the defendant guilty of felony murder. Under all the circumstances, we have no hesitancy in holding that any error in the admission of defendant's statement into evidence at the trial was harmless error beyond a reasonable doubt.

The judgment of the district court is affirmed.