No. 53,344

STATE OF KANSAS, *Appellee,* v. STANLEY JOHNSON, JR., *Appellant.*

(643 P.2d 146)

Opinion filed April 3, 1982.

*Ronald E. Wurtz,* of Topeka, argued the cause and was on the brief for the appellant.

*Randy M. Hendershot,* assistant district attorney, argued the cause, and *Robert T. Stephan,* attorney general, and *Gene M. Olander,* district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

FROMME, J.: Stanley Johnson, Jr. was convicted by a jury of first degree murder (K.S.A. 21-3401) and of aggravated robbery (K.S.A. 21-3427). He raises six points on appeal.

The victim, William Juett, lived in an upstairs apartment at 1118 Kansas Avenue, Topeka, Kansas. On October 20, 1980, at 5:38 p.m. a citizen stopped a police officer and reported that blood had dripped into a first floor apartment at 1118 Kansas Avenue. Officers entered the Juett apartment and found Juett lying on the floor in a pool of blood. The coroner determined the time of death to be around 9:00 p.m. on October 19, 1980, and that the victim may have lived from one to five hours after the attack. An autopsy disclosed five stab wounds in the chest, a split forehead, and bruises on the face. The hemorrhage of blood from these wounds caused his death.

A police investigation disclosed that the victim kept rather large amounts of currency and cash on hand. The defendant was observed by a neighbor leaving the victim's apartment between 3:00 and 5:00 p.m. on October 19th. He entered a cab with a suitcase. Later he returned to the apartment house and carried out a vacuum cleaner. The cab driver testified he picked up a black male at the victim's address, and the man was carrying a vacuum cleaner, a briefcase, and a bag of pennies. The cab driver picked the defendant's picture from a photographic lineup. He further testified he dropped the man off in the 1600 block of Van Buren. Defendant's residence was at 1628 Van Buren.

A vacuum cleaner and tape recorder were found at defendant's address. The victim's conservator identified the vacuum cleaner as belonging to Juett, and the serial number on the tape recorder matched the serial number on a tape recorder box found in Juett's apartment. Two towels found in Juett's apartment contained

human blood compatible with defendant's blood type. When the defendant was questioned, one hand had been injured from a cut.

Defendant's mother lived in an upstairs apartment across the hall from Juett's apartment. A pair of men's shoes was discovered in defendant's mother's apartment. They had traces of human blood on them. A partial latent palm print was found on the top of Juett's kitchen stove. Comparison of prints disclosed it was made by defendant.

Girtha Hollingsworth, defendant's common-law wife, testified at trial that the defendant brought home the vacuum cleaner and a briefcase on October 19th. She testified defendant brought home some money at that time, took the family to dinner, paid various bills, and gave $100.00 to her. Mrs. Hollingsworth's daughter Sarah testified that the defendant borrowed $2.50 from her before leaving the house on Sunday, October 19th. When she next saw the defendant at 10:00 p.m. that evening he showed her $350.00 to $400.00. She further testified that her mother told her the defendant had $929.00. Another daughter Alnita testified that when the defendant returned to the house at 5:00 p.m. he brought the vacuum cleaner and showed her a large amount of money. Defendant gave her the tape recorder.

Defendant steadfastly denied killing Mr. Juett and at trial testified he had cut his hand on a broken aquarium and also injured this hand while cutting up chicken. He testified that he washed Juett's windows in the apartment on Saturday, the 18th. He further testified that on the 19th he visited his mother who lived in the same apartment building. Some time after 3:00 p.m. on the 19th he observed a man leaving Juett's apartment building with blood stains on his shirt and pants. Defendant said he later took out the trash and found the vacuum cleaner and tape recorder while rummaging in the trash. He opened the wound in his hand while looking through the trash so he went to Juett's apartment in search of a band-aid. When no one answered his knock, he entered the unlocked door and found Juett on the floor with towels covering his face and chest. He removed the towels and discovered Mr. Juett was not breathing. He became scared and left. He testified the money he had on Sunday the 19th was his Christmas savings. He decided to use it when the welfare agency would not pay the delinquent gas bill. Additional testi-

mony will be discussed in connection with each point raised by defendant.

Defendant-appellant contends the trial court erred in refusing to suppress statements made by him to the police on October 22nd. This was the second time he was interrogated. He was taken from his home to police headquarters and again advised of his "*Miranda* rights." He was then asked to tell the officers again of his activities on Sunday, the 19th. Defendant refused saying he had already told them everything and didn't want to go over it again. He was asked if he cared to take a polygraph test and he said he would. However, he asked to call his lawyer before taking it. He was handed a telephone directory and he used the phone but was unable to locate his attorney. He then changed his mind about taking the polygraph test. The request made was to call his attorney in regard to taking the polygraph test. It was not a specific request for the presence of his attorney during further interrogation.

Later that morning defendant was waiting in an outer office in the county courthouse. Lt. Tom Sargent of the police department happened by, apparently by chance and not design. They knew each other and Lt. Sargent struck up a conversation with defendant. The conversation covered a wide range of subjects. During this conversation it was defendant who initiated the discussion as to the Juett death. Defendant was again advised of his rights, waived them, and again told his story to Lt. Sargent.

Defendant relies on *Edwards v. Arizona,* 451 U.S. 477, 68 L.Ed.2d 378, 101 S.Ct. 1880 (1981), but that case is distinguishable in that defendant in the case at bar did not express a desire to deal with police only through counsel, and the trial court's finding that defendant initiated subsequent conversation with Lt. Sargent is supported by the evidence. According to Lt. Sargent, the conversation was relaxed, over cigarettes and coffee. Defendant confessed to no wrongdoing, but made damaging statements which were changed by him at trial. Defendant told of cleaning the windows and mopping the floors in Juett's apartment on the 18th. He further stated he had purchased the vacuum cleaner and tape recorder from an unknown Negro male.

It was these statements made by defendant on the 22nd which the trial court refused to suppress after a *Jackson-Denno* hearing. Defendant relies on the fact that the questioning continued after he had previously advised the police he did not want to repeat the

statements he had made the day before, and he relies on the additional fact that he asked to call his lawyer before taking a polygraph.

The rules governing are set forth in *State v. Newfield,* 229 Kan. 347, 623 P.2d 1349 (1981):

"If police interrogation of a person in custody continues and a statement is taken in the absence of an attorney after the person has requested an attorney, a heavy burden rests on the State to demonstrate that the person knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." 229 Kan. 347, Syl. ¶ 1.

"In determining the voluntariness of a confession, it is to be viewed in light of the totality of the circumstances, including the following factors: (1) The duration and manner of interrogation; (2) the accused's ability upon request to communicate with the outside world; (3) the accused's age, intellect and background; and (4) the fairness of the officers in conducting the interrogation. Essential to the inquiry is the determination that the statement was the product of the free and independent will of the accused. If the accused was not deprived of his free choice to admit, deny or refuse to answer, the statement may be considered voluntary." 229 Kan. 347, Syl. ¶ 2.

"In cases of in-custody interrogation, police officers have the duty to take effective means to notify a person of his right to silence and to assure that the exercise of that right will be scrupulously honored. The critical safeguard required is the person's right to cut off further interrogation elicited by express questioning or its functional equivalent in the form of any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response." 229 Kan. 347, Syl. ¶ 3.

In our present case defendant was advised of his rights and his right to an attorney was honored when he was given the telephone directory and an opportunity to call. The request for an attorney was conditioned on taking a polygraph test and when he was unsuccessful in reaching his attorney he refused to take the polygraph test. It was a substantial time later that he and Lt. Sargent met and struck up their conversation. This was not by design. After again being advised of his rights the informal questioning continued. Applying the rules in *State v. Newfield,* 229 Kan. 347, we hold the statements were voluntary and defendant's rights were scrupulously honored. The trial court did not err in refusing to suppress the statements. See also *State v. Nichols,* 212 Kan. 814, 816, 512 P.2d 329 (1973).

Appellant's next point concerns the trial court's failure to strike the testimony of two officers when the prosecution failed to produce police reports under K.S.A. 22-3213 (Ensley). Subsection (2) of the statute states:

"After a witness called by the state has testified on direct examination, the court shall, on motion of the defendant, order the prosecution to produce any statement (as hereinafter defined) of the witness in the possession of the prosecution which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use."

At trial both Special Agent Young and Detective Gilchrist testified that after an interview with the defendant they went to the crime scene to see if the windows in the victim's apartment had been washed recently. They both testified the windows had not been washed recently. Request was made by the defense for a copy of the officers' report concerning this investigation. The prosecution responded that if a report was made and available, the defendant was certainly entitled to have a copy. However, the prosecution had been all through the police records and could not find any report on this phase of the investigation. Further, it could not be established that the requested report had in fact ever been made.

In *State v. Wilkins,* 220 Kan. 735, Syl. ¶ 3, 556 P.2d 424 (1976), it is said:

"A trial court exercising its discretion in ruling upon a motion to strike the testimony of a witness for failure of the prosecution to produce a statement pursuant to K.S.A. 22-3213(2), should consider why the statement was not produced; if it was lost, the facts and circumstances surrounding the loss; the negligence or fault on the part of the state; the nature, relevance and importance of the statement; the risk of prejudice to the defendant; the essentiality of the testimony to the state; and the other evidence in the case."

After considering each of these matters specified in *Wilkins* in light of the facts of the present case we find no prejudicial error. It concerned a matter which was minor in nature, bearing on the credibility of defendant, and it was not established that a report was ever made or filed with the department.

Appellant further contends it was error for the court to allow both officers to testify that the windows were not clean because it permitted cumulative evidence to be presented by the State.

It is pointed out in *State v. Bright,* 229 Kan. 185, 191, 623 P.2d 917 (1981), that it lies within the authority of a trial court to limit the number of witnesses on a single issue, and it lies within the judicial discretion of the court as to where the line should be drawn on the number of witnesses permitted. When two wit-

nesses for the prosecution give cumulative testimony on the same subject to impeach the defendant's testimony, and the testimony of both witnesses is relevant, no error results, for the admission of cumulative evidence, if relevant, rests in the judicial discretion of the trial court. We find no abuse of discretion here.

The appellant contends the trial court erred in admitting into evidence repetitious, gruesome, and repulsive photographs of the victim's corpse taken at the scene of the crime and during the autopsy. We have examined these photographs. In a crime of violence which results in death, photographs which serve to illustrate the nature and extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to testimony of a doctor as to the cause of death even though they may appear gruesome. *State v. Wilson,* 220 Kan. 341, Syl. ¶ 5, 552 P.2d 931 (1976).

The naked corpse of a person who has been badly beaten, stabbed five times, and had his forehead laid open, is not a pretty sight. Neither is the picture of a man's lung which has the appearance of having hemorrhaged from a stab wound. However, Mr. Juett was discovered in his apartment under circumstances indicating a violent death. The actual cause of death could only be determined by an autopsy. The pictures were helpful and relevant to explain the testimony of the coroner. We find no reversible error in their admission. See *State v. McCorgary,* 224 Kan. 677, 681, 585 P.2d 1024 (1978).

Appellant next alleges error in permitting a daughter to relate a conversation had with her mother for the reason the statements of the mother were subject to marital privilege claimed by the defendant-husband.

The mother had previously denied on the witness stand that she knew how much money her husband had when he returned home. When pressed for the amount she stated, "I didn't count it." The daughter was then permitted to testify that her mother told her the money amounted to $929.00.

The marital privilege is declared in K.S.A. 60-423, as to criminal actions, and gives the accused a privilege to prevent his spouse from being called as a witness to testify against the accused with respect to any confidential communication. This privilege is covered again by 60-428 subject to 60-437. This latter provision covers waiver of the privilege. The marital privilege

declared in K.S.A. 60-423(*b*) and 60-428 applies to communications transmitted between spouses, and under K.S.A. 60-437 such privilege may be waived if the judge finds that the person claiming the privilege, without coercion, trickery, deception, or fraud practiced against him or her, made disclosure of any part of the matter to a third person.

In the case at bar the defendant displayed the money openly before at least three family members. The daughter did not disclose a confidential communication between spouses. The mother did not tell the daughter what the spouse had told her in confidence. The defendant's disclosure of the money was openly made to the daughter as well as to the mother and another daughter. The intended transmission of the communication to a third person by a person later claiming the privilege will generally negative any implication of confidentiality. 8 Wigmore on Evidence § 2336 (McNaughton rev. 1961); *State v. Benner*, 284 A.2d 91 (Me. 1971). The conversations between mother and daughter are not privileged under these circumstances. *State v. Glover*, 219 Kan. 54, Syl. ¶ 3, 547 P.2d 351 (1976).

The final point raised by appellant concerns a charge of prosecutor misconduct during closing arguments.

The district attorney in an attempt to convince the jury that defendant's testimony was not believable made the following statements during closing argument:

"But what did he say he did? Oh, he got scared and just left. But did he ever tell anybody? Is there any evidence? And all the opportunities to talk to all the people that he talked to, that he once, other than to his attorney, once mentioned the name of a Damon Jones to anybody? No, he didn't. Here we are, this is March the third or March the second, excuse me, some — What would that be? — about five months and now we hear for the first time Damon Jones, and where do we hear it at? From the defendant when he's on trial for first degree murder."

Defense counsel immediately objected to these statements as not fair comment on the evidence. The objection was overruled. It turns out that Damon Jones was the person alleged by defendant to have run from Juett's apartment house with blood stains on his shirt and pants. Before the trial, defense attorney had requested that an assistant district attorney run checks on this man. So the prosecutor's office had been advised of this man before trial and the district attorney's statement that defendant had not once mentioned the name of Damon Jones to anyone was a misstatement persisted in by the prosecutor even after the defense attor-

ney had approached the bench and refreshed the prosecutor's recollection. The prosecutor stood by and allowed the judge to persist in upholding the previous order overruling the objection. The judge then instructed the jury to disregard the defendant's objection. Later, on the argument of a motion for new trial the prosecutor admitted that the defense attorney had requested the check on Damon Jones before trial. Therefore the statement made during closing argument was false.

Even if this false statement was made from mere oversight and not to intentionally mislead the court and jury, the court erred in overruling the objection. A prosecutor may appeal to the jury with all the power and persuasiveness his learning, skill, and experience enables him to use so long as his comments are confined to the evidence and reasonable inferences drawn therefrom. However, he is an officer of the court and is guilty of gross misconduct if he asserts facts to be true which he knows, or should have known, to be false. *Berger v. United States,* 295 U.S. 78, 84, 79 L.Ed. 1314, 55 S.Ct. 629 (1935). See also *State v. Dorsey,* 224 Kan. 152, Syl. ¶ 1, 578 P.2d 261 (1978).

Although it was error to permit the prosecutor's statements to remain in the record over objection, we must determine whether such constituted harmless error. In applying the Kansas harmless error rule (K.S.A. 60-2105) in line with the state and federal constitutional requirements, a court must be able to declare the error had little, if any, likelihood of having changed the result of the trial and the court must be able to declare such a belief beyond a reasonable doubt. *State v. Thompson,* 221 Kan. 176, Syl. ¶ 5, 558 P.2d 93 (1976); *Chapman v. California,* 386 U.S. 18, 17 L.Ed.2d 705, 87 S.Ct. 824 (1967). The only testimony during the trial concerning Damon Jones was that of the defendant who told the story about seeing the black man with blood stains on his shirt and pants coming out of Juett's apartment house. On cross-examination defendant said the man was Damon Jones. The testimony in this case need not be further detailed. Suffice it to say the evidence of defendant's guilt was overwhelming. The testimony of the cab driver and the neighbor placed defendant in the apartment house at or about the time Juett met his death. His possession of the victim's vacuum cleaner and tape recorder, and the possession of hundreds of dollars the same day he had borrowed money from a stepdaughter also pointed to his guilt.

His palm print in the apartment and his blood type on bloody towels in the victim's apartment pointed to his guilt, especially when coupled with the fresh cuts on his hand and the apparent misstatements made by him.

The misconduct of the prosecutor in representing that defendant had not disclosed his story concerning Damon Jones prior to trial was directed toward questioning defendant's credibility. Defendant's credibility had been in serious question on various other matters including his story of cleaning Juett's apartment windows and his discovery of the vacuum cleaner and tape recorder in the trash at the Juett apartment house. Considering the nature and extent of the evidence of guilt of the defendant in this case this court is able to declare the error had little, if any, likelihood of having changed the result of the trial, and we are able to declare such a belief beyond a reasonable doubt.

The judgment is affirmed.